# Illinois Official Reports

## Appellate Court

---

**In re Commitment of Brown, 2021 IL App (1st) 191606**

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF LEROY BROWN (The People of the State of Illinois, Petitioner-Appellee, v. Leroy Brown, Respondent-Appellant). |
| District & No. | First District, Third Division<br>No. 1-19-1606 |
| Filed<br>Rehearing denied | November 3, 2021<br>November 17, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-80013; the Hon. Peggy Chiampas, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael R. Johnson, Kate E. Levine, Ian C. Barnes, and Logan C. Bierman, of Johnson & Levine LLC, of Chicago, for appellant.<br><br>Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Michael M. Glick and Erin M. O'Connell, Assistant Attorneys General, of counsel), for the People. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Ellis and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, respondent Leroy Brown was found to being a sexually violent person (SVP) under the Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1 *et seq.* (West 2016)). Following a dispositional hearing, respondent was placed on conditional release with the Department of Human Services (DHS). Under the SVP Act, a person may be found to be an SVP after having been convicted of a sexually violent offense and is found dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence. *Id.* § 5(f).

¶ 2    On appeal, respondent argues that (1) the trial court erred in denying his request to ask prospective jurors if they could be fair and impartial knowing that respondent had been convicted of a sexually violent offense against a child, (2) the trial court erred in denying his motion for a mistrial after the State attempted to introduce inadmissible testimony that respondent had failed questions on a polygraph examination, (3) the trial court improperly restricted his cross-examination of the State's witnesses regarding the limitations and controversy surrounding the diagnosis of other specified paraphilic disorder, nonconsenting persons (OSPD nonconsent), and (4) the trial court erred in allowing the State to introduce irrelevant and prejudicial testimony about the Department of Corrections statistics detailing the percentage of sex offenders that are screened and not referred for civil commitment.

¶ 3    In 2011, the State filed a petition to commit respondent as an SVP under the SVP Act. In the petition, the State alleged that respondent had been diagnosed with paraphilia not otherwise specified and a personality disorder not otherwise specified, nonconsent, nonexclusive, and that this mental disorder was a congenital or acquired condition affecting respondent's emotional or volitional capacity, which predisposes respondent to commit acts of sexual violence. In June 2011, the trial court conducted a probable cause hearing and found probable cause for the SVP proceedings. An amended SVP petition was filed in October 2017 and alleged that respondent suffered from OSPD, nonconsenting females, in a controlled environment and an antisocial personality disorder.

¶ 4    Prior to trial, both parties filed multiple motions *in limine*. Specifically, respondent moved to preclude all testimony about purported statistics on the Department of Corrections's screening process for SVP. At the hearing on the motion, the prosecutor indicated that the doctors would not testify to the percentages, but would testify to the screening process. Respondent asked for clarification of what would be allowed, and the court responded:

> "I believe that, again, in the context of the triers of fact in this particular case being a jury, being informed of the context, then if the doctors are going to be testifying, then the screening process itself is fair game, quite frankly, to be brought up. What may not be is the specific indication of 96 percent of cases that are screened are not brought to court. As that specifically relates to [respondent], that will not be allowed and [the prosecutor] has indicated that they will not be eliciting that testimony."

¶ 5    In one of its motions *in limine*, the State asked the court to preclude any testimony or argument that would suggest or infer that OSPD was not a legitimate diagnosis. At the hearing, defense counsel objected, stating that she did not have an objection if the motion was limited to a *Frye*[1] issue, but arguing that counsel "should be able to cross on that diagnosis." The prosecutor responded that respondent's counsel could question whether respondent has the diagnosis, but was specifically asking to bar questioning of the legitimacy of the diagnosis in general. The court granted the motion, but indicated that defense counsel could request a sidebar and the court would revisit it.

¶ 6    Also, before trial, respondent filed a request to ask the venire several proposed jury questions for *voir dire*, including the following question: "You will hear evidence that Mr. Brown committed a sexually violent offense against a child. Having heard that evidence, will you be able to be fair and impartial in reaching your decision in this case?" The State objected to this proposed question and argued that the prospective jurors were already going to be asked about the fact that respondent had been convicted of a sexually violent offense and whether they can be fair and impartial. The trial court agreed with the State and declined to ask respondent's proposed question.

¶ 7    The following evidence was introduced at respondent's November 2017 jury trial. Dr. David Suire testified as an expert in forensic and clinical psychology, specializing in sex offender evaluations. He was employed as a clinical psychologist and SVP evaluator with the Illinois Department of Human Services (DHS). During the examination of Dr. Suire's background, the prosecutor asked him how many individuals are referred for commitment in Illinois that he has examined. Dr. Suire answered that "the referral rate is usually two to two and a half percent would be referred forward, so 97, 98 percent would not" be referred. Defense counsel objected and following a sidebar, the trial court overruled the objection.

¶ 8    Dr. Suire was assigned to evaluate respondent as part of the standard rotation with SVP evaluators. He reviewed respondent's police record, court records, a prior SVP evaluation, Department of Corrections records, and records from the Rushville treatment and detention facility (TDF). He also reviewed current records in the weeks prior to trial. Dr. Suire attempted to interview respondent in 2011 at the TDF, but respondent declined to participate in an interview. Dr. Suire testified that he had "plenty of documentation" in respondent's case to complete the evaluation without the interview.

¶ 9    Dr. Suire prepared his first report on July 30, 2011, and an addendum was prepared on September 19, 2013. The purpose of the addendum was to update the diagnosis because the new version of the Diagnostic and Statistical Manual of Mental Disorders (DSM) was released and he wanted the original diagnosis to meet the standards of the new DSM. The new version is DSM-V and was still in operation at the time of the trial.

¶ 10    Respondent's records dated back to 1976, and he was arrested 12 times between 1976 and 1981. The arrests included burglary, armed robbery, unlawful use of a weapon, theft, and drug charges. He was convicted 11 times. Dr. Suire noted that the armed robbery was most concerning because of the aggression that was relevant to the SVP assessment. Based on his review, it did not appear that respondent successfully completed probation. Respondent also

---

[1]The purpose of a test pursuant to *Frye v. v. United States*, 293 F. 1013 (D.C. Cir. 1923), is to exclude new or novel scientific evidence that undeservedly creates a perception of certainty when the basis for the evidence or opinion is actually invalid. *In re Detention of New*, 2014 IL 116306, ¶ 26.

received jail time in that period and was subsequently paroled, but he did not appear to successfully complete his parole. Dr. Suire found this history relevant to show that sanctions were not effective in getting respondent to cease this behavior and actual supervision was not successful in "controlling his criminal urges."

¶ 11     In January 1984, while on parole for armed robbery, respondent committed a sexually violent offense. Respondent then fled to Minnesota, and there, he committed another sexually violent offense in June 1984. He was convicted of armed robbery, rape, and burglary in Minnesota and sentenced to 11 years on one count and 7 years, 11 months on another count. Dr. Suire observed that the close proximity of the two sexually violent offenses "goes to the intensity of the urges to commit sexual offenses."

¶ 12     In the Minnesota case, respondent broke into the house of a woman he previously knew and used a knife to force her to have sexual contact with him. He held a knife to her throat, removed her clothing, and placed his mouth on her vagina. He attempted to penetrate her vagina with his penis, but he was unable to attain an erection. Respondent became frustrated and attempted to cut the victim's vagina with the knife. The victim tried to take the knife from respondent and suffered cuts on her hand. Respondent then ended the sexual offense and demanded money. He took her purse and left. The sexual offense occurred while a child was present. Respondent has admitted to this offense and described the knife as 12 inches in length. Dr. Suire stated that this conviction was a sexually violent offense under the SVP Act.

¶ 13     Respondent was later charged for the January 1984 Illinois offense while he was incarcerated in Minnesota. He was subsequently convicted of rape and sentenced to 20 years. In that offense, respondent broke into a woman's home and forced her to the ground. He then forced sexual intercourse by penetrating her with his penis. He did not use a condom, and he ejaculated. Respondent admitted to this crime. He said the victim was crying, but at the time he did not care. Later, respondent felt bad about it.

¶ 14     Dr. Suire noted the similarity in the two offenses where he broke into the houses of the victims. Respondent reported that he knew both victims. He used a weapon in one and force in the other. Respondent was paroled after he completed his sentence in the Illinois case, but he did not successfully complete his parole because he committed a new sexual offense in 1996.

¶ 15     In the 1996 case, respondent was charged and convicted of aggravated criminal sexual abuse. The victim was 10 years old, while respondent was 37. He received a 30-year sentence. In this case, respondent pried open a window to access the victim's room. She awoke to find respondent kneeling by her bed with his hand under her underwear and fondling her vaginal area. The victim was able to flee and told her mother and other family members. Respondent was arrested at his home, which was across the street from the victim. The victim's 16-year-old cousin was asleep in the room while the offense occurred.

¶ 16     Dr. Suire observed that respondent's action of committing the offense with another individual in the room showed that he was "not particularly worried about being detected." He also noted that the commission of this offense after respondent had already received a 20-year sentence indicated that "a very significant criminal sanction that included supervision in the community did not dissuade or help him to control his risk." Respondent initially denied committing this offense, but he later acknowledged it.

¶ 17     Dr. Suire testified that not all of respondent's sex offenses resulted in charges or convictions, which was not uncommon. He considered the facts of those offenses as relevant

to his opinion because the full range of the offense history is needed for the purpose of treatment and assessment. These other sex offenses were included in respondent's records. Respondent admitted that his first sex offense occurred when he was 9 years old. He described offenses committed against children and sleeping persons. He used bribery, drugs, and alcohol to gain access to victims. He had sexual contact with persons who were cognitively limited as well as using weapons and force. Respondent also reported around 117 instances of voyeurism and 89 contact offenses, which included a total of 47 victims. Respondent also discussed having fantasies involving bondage and forcible sex.

¶ 18    While incarcerated, respondent has not committed any sexual offenses. In 2016, respondent grabbed the hand of a staff member, but she stopped him. Dr. Suire considered this to be inappropriate sexual behavior. Respondent's lack of sex offenses in prison did not change Dr. Suire's opinion because most people who commit rapes in the community do not commit them in prison. Dr. Suire described respondent's disciplinary history as "unremarkable" and noted he had 21 violations, including insolence and various rule violations. He noted an instance from 2017, where respondent became frustrated and made a statement indicating that "when people start getting assaulted and going to hospitals, maybe people would pay attention to the facility." Respondent was given a warning for insolence, but Dr. Suire thought it was significant that respondent's mind still goes to violence when he gets frustrated.

¶ 19    Dr. Suire defined a mental disorder under the SVP Act as a "congenital or acquired condition that predisposes a person to commit acts of sexual violence." He also explained that cognitive distortions are "beliefs about the world that would predispose, encourage or allow a person to commit sexual offenses." Respondent appears to have cognitive distortions because respondent discussed his belief that men should always be strong and assertive in sexual relationships. Respondent also has made statements indicating that just because a woman says she does not want to have sex, it does not necessarily mean she does not. Respondent expressed hope that what began as a nonconsenting sexual offense could evolve into a consenting one. Respondent also demonstrated instances of a "victim stance," such as focusing on how others have mistreated him. Respondent has acknowledged some of these distortions.

¶ 20    Dr. Suire noted some positive actions. Respondent has gone to treatment and stayed in treatment. He is making a "legitimate effort." Respondent has admitted things that were not known. He also noted that on the negative side, respondent was very early in treatment, and he has not started working in earnest on "coming up with interventions or actually changing the thoughts." Dr. Suire thought respondent was "doing fine for where he's at, but he's got a lot of work to do."

¶ 21    In his evaluation, Dr. Suire used the DSM for his assessment. He used the DSM-IV for his 2011 report and the DSM-V for the 2013 addendum. He diagnosed respondent with OSPD, nonconsenting females, nonexclusive type; mild alcohol use disorder; and antisocial personality disorder. He described a paraphilia as an "atypical sex interest." For it to be a disorder, the atypical interest "would need to cause difficulty for the person or some other sort of problem for society." He further explained that in respondent's case:

> "[H]e has several sexual offenses that he's been convicted of that involve nonconsenting persons, he has reported a large number of additional sexual offenses that involve nonconsenting persons. This pattern has continued for more than six months which is a requirement. Given his history and what he has reported, there would appear to be underlying urges and fantasies related to these behaviors. So all of these

- 5 -

things would be consistent with a diagnosis of other specified paraphilic disorder, nonconsenting persons."

¶ 22 This is a congenital or acquired mental disorder. Dr. Suire specified nonexclusive type because respondent appeared to have an interest in consenting sex as well, but respondent appeared to have a pattern toward nonconsenting sexual contact. The frequency with which he sought it out and the way he sought it out suggested that nonconsenting sexual contact met his needs in some way that consenting sex probably did not. This paraphilic disorder is not considered to change on its own. The large number of victims and acts suggested the chronic nature of his disorder, as well as the intensity of his urges and his lack of ability or willingness to control them. Dr. Suire opined at the trial that respondent continued to suffer from OSPD, nonconsenting females, nonexclusive type. He explained that this opinion was based on the following:

"I believe based on [respondent's] history, the fact that he has a very long and chronic history suggesting those urges were present well into adulthood, that his more recent reports have been consistent with the presence of these issues, and as I touched on because once—once a sexual interest is set, a person may learn to control it or to manage it but it's unlikely to simply disappear."

¶ 23 Dr. Suire further discussed his diagnosis of antisocial personality disorder, which is "characterized by a pervasive pattern of disregard for and violation of the rights of others. Typically that would involve criminal behavior." In respondent's case,

"we touched on his criminal history and he has a very extensive criminal history of both sexual and nonsexual offenses. His offenses have included aggressive acts both sexual and nonsexual. He has taken advantage of other people. He has a history of deceptive behavior. He doesn't always report things accurately. There's manipulation, not a great deal of remorse, if any. And these are all things that you would expect to find with anti-social personality disorder."

¶ 24 Dr. Suire explained that the behavior for antisocial personality disorder should begin to appear by age 15 and respondent had been sexually offending from the age of 9. This is a congenital or acquired condition. Personality disorders tend to be lifelong, but may change how they are expressed over time. Regarding respondent, Dr. Suire opined:

"What I would expect with [respondent] is that while, for example, he may remain aggressive and have aggressive urges, that he's a lot more likely at 58 to pick his spots. He's not just going to be getting in a fight with everybody that walks by, that he's going to express his aggression in ways that he thinks he can get away with. I think people get a little older, they get a little wiser in terms of how to express it. And even though I think he's pretty physically fit, he's probably not as physically capable as he was at 22. So that's—that would be an example of people learn a little better to—they usually don't want to get themselves hurt, so they learn to express their aggression a little more effectively. And that's the kind of thing I would expect to see."

Dr. Suire observed that the antisocial personality disorder, combined with a paraphilia, would "exacerbate the risk."

¶ 25 As for the mild alcohol use disorder, Dr. Suire noted that respondent has reported a history consistent with this diagnosis, but it was not clear how severe the alcohol problem was. For the purpose of the assessment, it did not make a great deal of difference if respondent's alcohol

use was abuse or dependence. Alcohol abuse will have a similar impact as the antisocial personality disorder because the alcohol will reduce his ability to control the urges toward nonconsenting sex or sex with children.

¶ 26    Dr. Suire also discussed how respondent's mental disorders affected the emotional or volitional capacity. The emotional capacity involves the ability to manage one's feeling and emotions, while volitional capacity would be the ability to manage one's behavior. Specifically, respondent's mental disorders affect his emotional and volitional capacity because "he finds it rewarding to seek out sexual contact with nonconsenting persons, it's arousing, that he's going to be more inclined to do that and less able to resist those urges than someone who didn't want to do it." In Dr. Suire's opinion, respondent's mental disorders predispose him to engage in acts of sexual violence and make it difficult for respondent to control his behavior.

¶ 27    Dr. Suire also conducted a risk assessment for respondent. He used the Static 99-R, an actuarial instrument, in his evaluations to assess respondent's risk of reoffending compared to other sex offenders. On the Static 99-R, respondent scored a 5 to 6, which placed him in the above average to well above average risk category. A score of 5 would be associated with a 2.7 times greater risk to engage in a future sex offense than other sex offenders, while a score of 6 would be associated with a 3.77 times higher risk.

¶ 28    He further found several dynamic risk factors present in his evaluation of respondent, including deviant sexual arousal, employment instability, any personality disorder, any substance abuse issue, hostility, and intoxication. He also considered protective factors, which are associated with a reduction in risk, which include age, health, and treatment progress. Regarding treatment, the TDF program is a five phase program. Respondent was at phase two at the time of the trial, which is where an individual takes responsibility for his actions, particularly sex offending behavior. In phase three, the person begins to develop interventions for this behavior, identify risk factors, and learns how to control it. During this testimony, the prosecutor asked if respondent had taken any polygraph examinations during treatment, and Dr. Suire responded that respondent had taken two. When asked why the polygraph examinations are used, Dr. Suire explained that it is not known whether someone was caught and prosecuted for every act they have committed, so the polygraph is used. At that point, defense counsel objected and a sidebar took place.

¶ 29    During the sidebar, defense counsel objected to the questions and testimony about the fact that there was a polygraph. Counsel argued polygraph evidence was inadmissible because it "lures jurors into believing that that tool has the sort of accuracy predictive power that the science has shown it simply does not." In response, the prosecutor stated that the results of the polygraph had not been given, nor would it be. The purpose was to discuss where respondent was in treatment and what he was still working on. The trial court overruled the objection.

¶ 30    When the direct examination resumed, the prosecutor questioned Dr. Suire about respondent's progress in admitting his offenses. In one answer, Dr. Suire stated that respondent did not pass one question on a polygraph. Defense counsel objected and the trial court sustained the objection, instructing the jury to disregard the response.

¶ 31    Dr. Suire did not think respondent's treatment was at a point where it could be considered a protective factor. Respondent has done "reasonably well in terms of how far he's got. But he's too early in treatment for it to be a protective factor for him at this point." He needs to make further progress. He opined that respondent would be a "very high risk" if he did not

- 7 -

learn to control his behavior. He also did not find respondent's age or medical conditions to be protective factors. Age was associated with reduction in risk, which was built into the actuarial instrument, so Dr. Suire did not give him an additional reduction. Respondent was reasonably healthy with typical middle age issues, but nothing that would prevent or seriously inhibit his ability to commit a sexual offense.

¶ 32    In his opinion, it is substantially probable that respondent would engage in future acts of sexual violence. Dr. Suire explained that substantially probable meant "much more likely than not." Respondent was dangerous because he suffers from a mental disorder that is congenital or acquired, the mental disorder affects his emotional or volitional capacity, and the disorder predisposes him to commit acts of sexual violence in the future.

¶ 33    Prior to cross-examination, defense counsel renewed his motion for a mistrial based on testimony about the polygraph. The trial court denied the motion and found as follows: "This line of questioning in this Court's opinion was being submitted for purposes of treatment and as such your motion for a mistrial is denied. I sustained the objection and directed the jury to disregard the response and there was no further inquiry regarding that."

¶ 34    During cross-examination, defense counsel asked Dr. Suire, "And the research has suggested that there can be different conceptualizations essentially of why people rape, right?" At that point, the prosecutor objected to the form of the question, expressed a concern that it would lead to a topic barred by the motion *in limine*, and requested a sidebar. In the sidebar conference, defense counsel indicated that he did not intend to "go down the line of saying there's no such diagnosis as [OSPD nonconsent]." Rather, counsel stated that he wanted to "explore the limits of that diagnosis so the jury can assess the weight to give it." The prosecutor responded that this topic was what the State requested not to be inquired into and "any question, suggestion or otherwise, argument" that OSPD nonconsent is not accepted for use was barred in the motion *in limine*. Defense counsel reiterated that he was not talking about admissibility, but for "the jury to be able to understand how much weight to assess for that diagnosis." The prosecutor responded that defense counsel was challenging the diagnosis that has been accepted in the courts, but he could challenge whether respondent actually had this diagnosis. The trial court sustained the objection and held that counsel could not challenge the validity of the diagnosis as a mental disorder. The court advised defense counsel to "tread very carefully" regarding the motion *in limine*.

¶ 35    Dr. Suire testified that, in Illinois, he has never referred someone for SVP commitment on an antisocial personality disorder alone, nor has he referred someone on an alcohol use disorder alone.

¶ 36    Dr. Mark Kuzia testified as an expert in clinical psychology, specializing in the area of evaluation and risk assessment of sex offenders. He was employed as a forensic and clinical psychologist with Wexford Health (Wexford). Wexford has a contract with the State of Illinois to complete SVP evaluations, which Dr. Kuzia conducts.

¶ 37    Dr. Kuzia was assigned to conduct a reevaluation of respondent. He reviewed police reports, prior evaluations, information from the State's Attorney, and Department of Corrections disciplinary information and records. Respondent declined Dr. Kuzia's request to interview him for the evaluation.

¶ 38    Dr. Kuzia prepared his report on October 30, 2015. He described respondent's criminal history as "lengthy" and detailed his knowledge of respondent's offenses. He noted that a report from Dr. Lesley Kane indicated that the victim from the 1984 Illinois rape was a

neighbor of respondent's sister. Respondent had been with his sister and the victim sometime during the day of the offense smoking marijuana and drinking. At some point, the victim went upstairs. Later that night, respondent entered her residence and sexually assaulted her. Dr. Kuzia noted that he was looking for "a pattern of behavior that indicates that [respondent] cannot control his urges and that he does not have volitional capacity and emotional capacity to self regulate."

¶ 39  After respondent fled to Minnesota, he committed another sexual assault. Dr. Kuzia recounted the details of that offense. He relied on another evaluator's report, which also included respondent's account of the offense. Respondent told the evaluator that he and the victim were listening to music and kissing. He mistook her intentions and took it to a different level and acted out. When the evaluator asked about respondent's use of a knife, respondent said he forgot about that and he used to knife to force compliance and held it at her neck.

¶ 40  Dr. Kuzia observed:

"Well, again we're starting to look at a pattern of behavior where the person has gone in now to two places, broken into both places, and assaulted a person that was a female against their will, so I'm looking at a pattern. And I'm also keeping in mind the fact that he was on parole, he—and—for the armed robbery offense. He was made aware that the police were looking for him, so he fled to Minnesota and he committed another sex offense while he was in Minnesota."

¶ 41  In reviewing respondent's treatment notes, Dr. Kuzia stated that respondent indicated that he had committed "118 hands-on sex offenses and 71 hands-off sex offenses" in the past. The treatment notes also showed that respondent admitted to seven victims where he forced sex, including one victim that was mentally disabled and unable to give consent.

¶ 42  Dr. Kuzia used the DSM-V for his evaluation. He diagnosed respondent to a reasonable degree of psychological certainty with OSPD, nonconsent in a controlled environment, and antisocial personality disorder. He described how respondent fit the criteria for OSPD nonconsent.

"So again what I'm looking for is as far as for it to be a paraphilia, I want to see a pattern of behavior that indicates that he's—has a problem in managing his control and his behavior related to the inappropriateness of it. So when it comes to offending against the nonconsent, you know, by looking at both his prior offenses, which were three, and again they were very consistent offenses, they were—all involved breaking into the home and offending against women that were vulnerable at the time and forcing himself in ways in which it was nonconsent. And I would say that it's nonconsent regardless of whether they're struggling or whether they're asleep. They're not consenting to the behavior. So in that way we've got—we've got a basis for it.

Now, what I'm also looking at is his prior history. I'm not just looking at the crime to determine whether he meets the disorder, I'm looking at his whole history. And his history indicates that he does have a prolonged history of acting out sexually ***. I'm also looking at fantasies and urges and behaviors that, you know, might also support and provide evidence for that.
***

Well, so basically I'm looking at fantasies and urges and behaviors as far as how predominant they are in the person's thinking. And, you know, if someone is so

- 9 -

preoccupied and focused on the fantasies and the behaviors, it's going to lend credence that yes, they have this deviant sexual fantasy towards a particular purpose."

¶ 43 Dr. Kuzia also described antisocial personality disorder as a "pervasive pattern or disregard for or violation of the rights of others." Respondent met the criteria, including his failure to conduct by social norms that lead to grounds for arrest, deceitfulness as shown when he detailed one of his sex offenses and failed to include the knife he used, and irresponsibility in that he has never held any kind of employment.

¶ 44 These mental disorders are chronic in nature and are not going to go away over time. Both of these disorders are congenital or acquired and affect respondent's emotional and volitional capacity that predispose him to engage in future acts of sexual violence.

¶ 45 Dr. Kuzia then performed a risk assessment using the Static 99-R. He scored respondent with a 4, which is an above average risk to reoffend. He also reviewed both dynamic and protective factors. He identified four dynamic risk factors for respondent: (1) sexual violence; (2) resistance to rules and supervision; (3) lack of emotional, intimate relationships with adults; and (4) lifestyle impulsivity. For protective factors, Dr. Kuzia noted that for age respondent got a one point reduction on his Static 99-R score. Respondent does not have any issues with his physical health to lower his likelihood to reoffend. And while respondent is in treatment, he continues to have cognitive distortions to justify his activity.

¶ 46 In his opinion, respondent suffers from a mental disorder that is congenital or acquired which predispose him to commit future acts of sexual violence.

¶ 47 Dr. Lesley Kane testified on respondent's behalf as an expert in clinical and forensic psychology, specializing in the assessment and evaluation of sex offenders. She was employed in private practice and by contract with the Du Page County circuit court.

¶ 48 Dr. Kane was contacted by defense counsel to perform an evaluation on respondent. She reviewed police reports, prior evaluations, and treatment records. Respondent agreed to participate in a clinical interview in October 2011. She submitted a report on November 16, 2011. She prepared an addendum in July 2014 to correspond with the new DSM-V. She also prepared a third report in August 2016 to incorporate additional treatment records and update risk assessment estimates.

¶ 49 Dr. Kane discussed her familiarity with respondent's sex offenses and other criminal history. She also discussed respondent's treatment records and indicated that respondent was in phase three. She described the things she reviewed in respondent's records.

"Well, in order to progress to the phase three which is [the] phase of treatment that he's in right now he had to disclose *** all of his sexual offense behavior, sexual history, and pass a polygraph or take a polygraph exam. So he had a number of different what they call offense descriptions in his record detailing different incidents that had occurred."

¶ 50 Dr. Kane diagnosed respondent with an alcohol use disorder in a controlled environment, a cannabis abuse disorder in a controlled environment, and antisocial personality disorder. She used the DSM-V for her diagnosis. She based the alcohol use disorder on respondent's pattern of drinking since his mid-teens. Respondent acknowledged that he would drink after school "pretty much every day when he was in high school and continued to do that." Respondent admitted that it was a major problem for him. Dr. Kane testified that the alcohol use disorder

did not qualify as a mental disorder under the SVP Act because alcohol abuse does not "directly lead an individual to commit a sexually violent offense."

¶ 51 Respondent also admitted to her that he smoked marijuana beginning as a teenager and, when he had the money, he would smoke every day until his arrest in 1996. This disorder also did not qualify as a mental disorder under the SVP Act.

¶ 52 Dr. Kane diagnosed respondent with antisocial personality disorder because he

"has a history of theft, burglaries, robberies, and aggressive acts so that lends support to the impulsivity and the reckless disregard for the safety of others, and the lack of responsibility, and there was I think at some point back then there was definitely a lack of remorse and consideration for the victims."

¶ 53 Respondent was showing consideration of his victims in his treatment. He has discussed how he minimized the violence and aggression with women. Dr. Kane opined that antisocial personality disorder can change over time as a criminal mindset dissipates. In the case of the respondent, his mindset was changing through maturity and the treatment. She noted that respondent obtained his GED and associate's degree while incarcerated.

¶ 54 Dr. Kane considered sexual disorders in her diagnosis, including pedophilia because one victim was a minor as well as OSPD nonconsent. She did not diagnose respondent with OSPD nonconsent because, in her opinion, respondent's behavior was more related to his antisocial personality disorder. She opined that it was "criminal behavior *** that [led] him to engage in the sexually violent act." In her opinion, respondent was "not becoming aroused off the force or the nonconsent, he [was] simply trying to get what he [wanted] when he [wanted] it." Respondent lacked empathy and was more egocentric.

¶ 55 Dr. Kane also assessed respondent's risk using the Static 99-R and the Static 2002-R actuarial instruments. On the Static 99-R, respondent scored a 4, which placed him in the above average risk category. This score indicated a risk of a 17% chance of respondent reoffending or being rearrested for a sexual offense in 5 years and a 27% chance in 10 years. On the Static 2002-R, respondent scored a 5, which placed him in the above average risk category with a 19% chance to reoffend in five years. She observed that respondent's scores will go down a point when he turned 60. He was 58 years old at the time of trial.

¶ 56 She also considered that respondent had been in treatment for six years while at the TDF as a protective factor. The dynamic factors that applied to respondent were noncooperation with supervision, antisocial personality disorder, substance abuse, intimacy deficits, and impulsivity. She noted the risk factor of respondent's history of sexual violence.

¶ 57 In her opinion to a reasonable degree of psychological certainty, respondent does not meet the criteria for commitment under the SVP Act.

¶ 58 During cross-examination, Dr. Kane admitted that about 98% of her testimony was given on behalf of respondents in SVP cases. She also admitted that she was paid for her work, including her testimony. She would not be asked to testify unless she found a respondent was not an SVP.

¶ 59 Dr. Kane does not believe that respondent is suffering from a congenital or acquired condition affecting his emotional or volitional capacity. In her opinion, respondent has control over his impulses. She admitted that respondent reported to romanticizing rape, having fantasies about resistance to sex, and reading fantasies and magazines where there was role playing involving sadism and respondent left out the consent. Respondent also admitted to

masturbating over 1000 times to fantasies of forcible vaginal, oral, and anal sex. Dr. Kane maintained that there was no clear evidence to suggest a paraphilic arousal pattern. Dr. Kane also admitted that in a deposition she stated that if respondent admitted to 20 other victims and talked about fantasies of nonconsensual sex, then she would be concerned and might have to change her opinion.

¶ 60 Dr. Kane also admitted that in respondent's most recent polygraph questionnaire, he indicated some arousal to consenting sex. He also indicated a breakdown of the arousal to nonconsenting sex, and he masturbates about a third of the time to rape fantasies and nonconsenting sex. Dr. Kane maintained that the admission of rape fantasies occurred in respondent's history, but admitted that she did not ask whether the rape fantasies were ongoing.

¶ 61 Respondent testified on his own behalf. His parents separated when he was five and his father left the house. His father was an alcoholic. Respondent turned to gang violence and gambling in his childhood because his mother could not afford the clothing his friends had, and he was then able to purchase the things he wanted.

¶ 62 While in the TDF, respondent has voluntarily participated in sex offender treatment and was in phase three. Respondent has learned that his past way of thinking was "detrimental" for him. He has learned emotional management and how to appropriately deal with anger. He has also found "a sense of empathy" and has realized the pain and suffering he caused people.

¶ 63 Following deliberations, the jury found respondent to be an SVP. Respondent filed a motion for a new trial, which the court denied. In October and December 2018, the trial court conducted a dispositional hearing and ordered respondent to be placed in conditional release once he completed his phase three treatment. On June 11, 2019, the trial court entered judgment on the jury's finding that respondent was an SVP and placed respondent on conditional release. DHS was ordered to develop a conditional release plan pursuant to the SVP Act and forward to the court and counsel within 60 days. The matter was continued for status on the conditional release plan.

¶ 64 This appeal followed, in compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017), with a timely notice of appeal filed on July 11, 2019. Accordingly, this court has jurisdiction of this appeal under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).

¶ 65 The SVP Act allows for the involuntary commitment of "sexually violent person[s]" by the DHS for "control, care and treatment until such time as the person is no longer a sexually violent person." 725 ILCS 207/40(a) (West 2016). As relevant here, a "sexually violent person" is defined under the SVP Act as "a person who has been convicted of a sexually violent offense, *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." *Id.* § 5(f). A "mental disorder" is a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 5(b).

¶ 66 On appeal, respondent first argues that the trial court abused its discretion when it denied his request to ask the prospective jurors if they could be fair and impartial knowing that respondent had committed a sex offense against a child. The State maintains that the trial court's *voir dire* was sufficient to ensure an impartial jury.

¶ 67 Specifically, as discussed above, respondent requested to ask the venire the following question: "You will hear evidence that Mr. Brown committed a sexually violent offense against a child. Having heard that evidence, will you be able to be fair and impartial in reaching your

decision in this case?" The State objected to this proposed question and argued that the prospective jurors were already going to be asked about the fact that respondent had been convicted of a sexually violent offense and whether they can be fair and impartial. The trial court agreed with the State and declined to ask respondent's proposed question. Respondent contends on appeal that questioning of the jurors about particular bias toward child sex offenders was critical for his informed use of peremptory challenges.

¶ 68    The purpose of *voir dire* is to assure the selection of an impartial panel of jurors who are free from bias or prejudice. *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 15. "The primary responsibility of conducting the *voir dire* examination lies with the trial court and the manner and scope of such examination rests within that court's discretion." *People v. Terrell*, 185 Ill. 2d 467, 484 (1998). The trial court possesses great latitude in deciding what questions to ask during *voir dire*. *Butler*, 2013 IL App (1st) 113606, ¶ 15. "As it is the duty of the trial court to manage the *voir dire*, the decision to permit supplemental questions by counsel during *voir dire* is within the discretion of the trial court." *Id.* An abuse of discretion will be found only where the trial court's conduct thwarted the selection of an impartial jury. *Id.*

¶ 69    "Where a trial deals with a controversial subject matter, prospective jurors should be questioned about the controversial subject matter to elicit facts of possible bias or prejudice regarding the controversial subject matter." *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 40. However, " '*[v]oir dire* is not to be used to indoctrinate jurors or to impanel a jury with a particular predisposition.' " *Id.* ¶ 39 (quoting *Butler*, 2013 IL App (1st) 113606, ¶ 17). "[T]he purpose of *voir dire* is not to ascertain prospective jurors' opinions with respect to evidence to be presented at trial." *Butler*, 2013 IL App (1st) 113606, ¶ 17. " 'So long as the procedures employed by the circuit court provided a reasonable insurance that prejudice, if any, would be discovered, the court's exercise of discretion would be upheld.' " *Gavin*, 2014 IL App (1st) 122918, ¶ 41 (quoting *People v. Allen*, 313 Ill. App. 3d 842, 845-46 (2000)).

¶ 70    During *voir dire*, the trial court informed the prospective jurors that, if selected as a juror, they would be asked to decide whether or not respondent was "a sexually violent person." The court asked prospective jurors several questions, including if they had ever been the victim of a crime and if they had any bias or prejudice against a person simply because that individual may be charged with a crime. The court also discussed with the parties, outside the presence of the jury, the wording of the following question that was posed to the entire venire:

> "I indicated to all of you that Mr. Brown, the respondent, is not currently charged with any criminal offenses as regards to this civil commitment proceeding. You will, however, be presented with testimony regarding Mr. Brown's criminal offense history. If you do not believe that you could be fair and impartial after hearing such testimony, please raise your hand."

The court struck two prospective jurors for cause who knew a victim of a sexual offense.

¶ 71    Respondent asserts that *Gavin* offers an example of an improper jury question and suggests that, under *Gavin*, his question was proper and should have been asked. However, we find that the decision in *Gavin* does not support respondent's argument.

¶ 72    In *Gavin*, the respondent argued on appeal that he should have been allowed to ask "whether the potential jurors could be fair and impartial given (i) he had been convicted of aggravated criminal sexual assault, attempted rape, rape, and indecent liberties with a child; and (ii) he had sexually offended against a juvenile." *Id.* ¶ 38. The reviewing court found the trial court's limitation on *voir dire* to be "reasonable." *Id.*

- 13 -

¶ 73      In addressing the respondent's claim that he should have been able to ask the jurors about his crimes, the reviewing court observed that "it is not the purpose of *voir dire* to preview the evidence for the jury or to measure the jurors' reactions to certain facts." *Id.* ¶ 44. As for the second question relating to his crime against a juvenile, the court observed that the respondent's requested question included the specific name of the offense. *Id.* ¶ 45. Specifically, the question requested by the respondent stated: " 'You will hear evidence that Mr. Gavin has been convicted of indecent liberties with a child. How would that affect your decision in this case?' " *Id.* The trial court declined his requested question. *Id.* The reviewing court held that the trial court reasonably precluded references to the names of the respondent's crimes and found no abuse of discretion. The court observed that the respondent "never proposed to ask potential jurors whether they could be impartial knowing that some of the victims of his sexually violent offenses were children." *Id.*

¶ 74      In its analysis, the *Gavin* court relied on the decision in *Butler* for support. See *id.* ¶¶ 42-44. In *Butler*, the respondent argued on appeal that the trial court deprived him of a fair and impartial jury because the court declined to inform the prospective jurors that the respondent had been convicted of three sexually violent offenses and ask whether they could remain fair and impartial. *Butler*, 2013 IL App (1st) 113606, ¶ 14. The respondent contended that the jurors could be more biased against a repeat offender. Instead, the trial court allowed a more general inquiry about the fact that the respondent had been previously convicted of a sexually violent offense. The reviewing court found no abuse of discretion. *Id.* ¶ 24. The *Butler* court observed that the trial court

> "struck the appropriate balance between informing the jurors of a particularly troubling aspect of the expected evidence, sexually violent offenses, and ascertaining any existing bias or prejudice in regard thereto versus the risk of being too specific and thus giving respondent the opportunity to inappropriately prequalify the jurors with regard to specific evidence." *Id.*

The reviewing court found "this more general inquiry was sufficient to ascertain any existing bias or prejudice for sexually violent offenders that would preclude a juror from being fair and impartial." *Id.*

¶ 75      We find *Gavin* and *Butler* support our conclusion here. Both cases observed that *voir dire* questions should not preview evidence or ascertain prospective jurors' opinions. The *Butler* court reached a balance between informing the prospective jurors of the respondent's history while avoiding disclosing too much information. The *Gavin* court recognized the deferential standard of review and noted that a trial court's limitation on supplemental questions would only be reversed "when the trial court's conduct thwarts the selection of an impartial jury." *Gavin*, 2014 IL App (1st) 122918, ¶ 41. The court in *Gavin* considered the specific question proposed in that case and found no abuse of discretion. Respondent has not shown such an abuse of discretion in this case. Here, the general inquiry about respondent's prior criminal convictions was fashioned with the parties to include respondent's nonsexual crimes. The jury heard evidence of respondent's criminal history of armed robbery, burglary, and theft, as well as the sexual offenses.

¶ 76      Defendant also relies on *People v. Strain*, 194 Ill. 2d 467, 470-73 (2000), to support his argument that the court erred in declining to ask about a bias toward persons who committed a sex offense against a juvenile. In *Strain*, the supreme court held that where gang membership and testimony from gang members was a significant aspect of the trial, the trial court did abuse

- 14 -

its discretion in refusing to ask jurors specifically about their attitudes toward gangs and whether their credibility determinations would be affected by gang affiliation. *Id.* at 480. However, Illinois courts have not extended *Strain* to any other specific areas of controversial inquiry. See *People v. Encalado*, 2018 IL 122059, ¶¶ 28-33 (prostitution); *People v. James*, 2017 IL App (1st) 143036, ¶ 40 (firearms); *People v. Anderson*, 407 Ill. App. 3d 662, 682 (2011) (prior convictions); *People v. Dixon*, 382 Ill. App. 3d 233, 245 (2008) (drug abuse).

¶ 77 Moreover, respondent's sex offenses, including the offense against a child, were not admitted as substantive evidence, but were detailed to explain the opinions of the expert witnesses. The trial court properly instructed the jury that the testimony was

> "allowed so that the witness may tell you what he relied on to form his opinion. The material being referred to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give the opinions testified to by this witness."

¶ 78 We find the jury was properly questioned to ascertain any bias or impartiality based on respondent's criminal history. Further, the jury was instructed that the details of respondent's offenses, including the offense against a child, were for a limited purpose and not to be considered for any other purpose. Respondent has not shown how the trial court's action thwarted the selection of an impartial jury, and we find no abuse of discretion in the trial court's decision.

¶ 79 Next, respondent contends that the trial court abused its discretion by denying his motion for a mistrial after the jury heard testimony that respondent failed a question on a polygraph examination. Specifically, respondent asserts that the trial court erred in denying his motion for a mistrial after the State elicited the results of respondent's polygraph examination after it had explicitly stated it would not do so. Respondent acknowledges that the trial court sustained his objection to this testimony and ordered the jury to disregard the response, but maintains that the testimony could not be unheard and it conveyed to the jury that respondent had been dishonest in his treatment. The State responds that no abuse of discretion occurred.

¶ 80 "A mistrial should be granted where an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuation of the proceedings would defeat the ends of justice. The trial court's denial of a mistrial will not be disturbed on review absent a clear abuse of discretion." *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). "[F]or a reversal following the denial of a motion for a mistrial, the appellant must show prejudice from the introduction of the incompetent evidence at issue and also that the resulting damage could not be remedied by the court's admonitions and instructions." *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 29.

¶ 81 Here, respondent argues that Dr. Suire's testimony that respondent did not pass one question on a polygraph examination was so prejudicial as to have affected the fairness of his trial. Initially, Dr. Suire referenced the use of a polygraph examination in respondent's treatment at the TDF. During a sidebar, the prosecutor informed the court that she did not intend to elicit the results of the polygraph. When the direct examination resumed, the following colloquy occurred.

> "THE PROSECUTOR: So has the respondent subsequently admitted offenses that he has denied?
> DR. SUIRE: Yes.

> THE PROSECUTOR: And is he still struggling with some of those offense[s] now?
>
> DR. SUIRE: It appears so. His most recent polygraph he didn't pass one of the questions.
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: That will be sustained."

The trial court also instructed the jury to disregard the response. Respondent later renewed his motion for a mistrial based on Dr. Suire's testimony, but the trial court denied the motion.

¶ 82 Illinois courts have consistently held that evidence pertaining to polygraph examination of a defendant is generally inadmissible. *People v. Gard*, 158 Ill. 2d 191, 201 (1994). However, a timely, sustained objection by the trial court and an instruction to the jury to disregard the testimony can correct this type of error. *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 54. We presume that the jury followed the trial court's instructions. *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 61.

¶ 83 We disagree with respondent's assertion that the State intended to elicit the evidence. The questions posed related to respondent's progress in admitting his offenses as an important phase in his treatment. The question about respondent's struggle was not seeking polygraph results, but sought information about his progress. When Dr. Suire responded with the polygraph result for one question, the trial court promptly sustained the objection and instructed the jury to disregard. We cannot find that this singular reference to a failed question which was stricken so prejudiced respondent's trial that a mistrial was necessary.

¶ 84 Further, respondent himself presented polygraph evidence through his expert, Dr. Kane. During her direct testimony, Dr. Kane discussed the requirements respondent satisfied to progress to phase three of his treatment, which included passing a polygraph examination. Later during cross-examination, Dr. Kane testified that respondent admitted arousal to consenting sex in his most recent polygraph. "The rule of invited error or acquiescence is a procedural default sometimes described as estoppel." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004).

> "Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *Id.*

¶ 85 Since respondent introduced evidence of respondent passing a polygraph test, he cannot establish that the single reference to a failed question prejudiced his trial such that a mistrial was necessary. The trial court properly sustained respondent's objection and instructed the jury to disregard the response, and we presume the jury adhered to the court's instruction. Accordingly, we find that the trial court did not abuse its discretion in denying respondent's motion for a mistrial.

¶ 86 Respondent next asserts that the trial court abused its discretion by preventing counsel from cross-examining the State's expert witnesses about the limitations of the OSPD nonconsent diagnosis and the professional controversy around it. The State maintains that the trial court properly limited cross-examination about the general validity of the diagnosis of OSPD nonconsent.

¶ 87 "A criminal defendant has a fundamental constitutional right to confront the witnesses against him and this includes the right to conduct a reasonable cross-examination." *People v.*

*Davis*, 185 Ill. 2d 317, 337 (1998). "The confrontation clause of the sixth amendment of the United States Constitution (U.S. Const., amend. VI) guarantees a defendant the right to cross-examine a witness against him for the purpose of showing the witness' bias, interest or motive to testify falsely." *People v. Harris*, 123 Ill. 2d 113, 144 (1988). "It is well established that a trial judge retains wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on such cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance." *Id.* Thus, " 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (Emphasis in original.) *Id.* at 144-45 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (*per curiam*)).

¶ 88 An expert may be cross-examined regarding his qualifications, experience and sincerity, weaknesses in his basis, the sufficiency of his assumptions, and the soundness of his opinion. *People v. Pasch*, 152 Ill. 2d 133, 179 (1992). "An expert may also be cross-examined with respect to material reviewed by the expert but upon which he did not rely." *Id.* Counsel is also permitted to test the knowledge and fairness of the expert by inquiring into what changes of conditions would affect his or her opinion, and in conducting such an inquiry, counsel is not limited to facts finding support in the record. *Id.* "[A]n expert may be cross-examined for the purpose of explaining, modifying, or discrediting his testimony, as well as to ascertain what factors were taken into account and what ones disregarded in arriving at his conclusions." *Id.*

¶ 89 "It is well-established that the scope of cross examination is an evidentiary ruling that is within the sound discretion of the trial court." *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 67 (citing *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 605 (2007)). Therefore, the trial court's ruling will not be reversed absent an abuse of its discretion, resulting in manifest prejudice to the respondent. *Id.* However, respondent argues that we should review this issue related to cross-examination *de novo* because the trial court's ruling was " 'frustrated by an erroneous rule of law.' " See *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (quoting *People v. Williams*, 188 Ill. 2d 365, 369 (1999)).

¶ 90 Respondent asserts that the erroneous rule of law occurred because the trial court failed to follow *Pasch*'s holding because the court did not allow respondent to cross-examine the State's experts about the reliability of the diagnosis or the controversy surrounding the OSPD nonconsent diagnosis. We disagree and find that the trial court's ruling was not based on an erroneous rule of law, but rather, the court reached an evidentiary decision from the circumstances of the case. "The decision whether to admit evidence cannot be made in isolation. The trial court must consider a number of circumstances that bear on that issue, including questions of reliability and prejudice." *Id.* The trial court in this case exercised its discretion in this ruling and, thus, we review it for an abuse of discretion.

¶ 91 Illinois courts have consistently held that OSPD nonconsent[2] is generally accepted within the scientific community. See *In re Commitment of Adams*, 2021 IL App (1st) 182049, ¶ 56; *In re Commitment of Walker*, 2014 IL App (2d) 130372, ¶ 74; *In re Detention of Melcher*, 2013 IL App (1st) 123085, ¶ 62; *In re Detention of Lieberman*, 2011 IL App (1st) 090796, ¶ 53.

---

[2]OSPD was previously classified as paraphilia not otherwise specified (PNOS) in the DSM-IV. See *In re Commitment of Adams*, 2021 IL App (1st) 182049, ¶ 53.

¶ 92    Prior to trial, the State filed a motion *in limine* to preclude any testimony or argument that would state or infer that OSPD was not a legitimate diagnosis. The trial court granted the motion, but indicated that the topic could be revisited during trial. In a sidebar conference during Dr. Suire's cross-examination, defense counsel indicated that he did not intend to "go down the line of saying there's no such diagnosis as [OSPD nonconsent]." But counsel stated that he wanted to "explore the limits of that diagnosis so the jury can assess the weight to give it." The prosecutor responded that this topic was what the State requested not to be inquired into and "any question, suggestion or *** argument" that OSPD nonconsent is not accepted for use was barred by the order granting the State's motion *in limine*. Defense counsel reiterated that he was not talking about admissibility, but for the jury to be able to understand how much weight to assess for that diagnosis. The trial court observed that it believed defense counsel was "splitting a very, very, very, very thin hair." The prosecutor responded that counsel was challenging the diagnosis that has been accepted in the courts, but he could challenge whether respondent actually has this diagnosis. The court held as follows.

> "You cannot challenge the diagnosis, [defense counsel]. The objection to the form of the question will be sustained. However, there is a motion *in limine*. I'm going to hold you to that motion *in limine* and, you know, I want you to tread very carefully because I will not allow you to specifically go into what the motion *in limine* addressed as to preclude you from getting into specifics regarding that diagnosis, okay?"

¶ 93    According to respondent, he does not dispute the admissibility of the OSPD nonconsent diagnosis, but contends that he should have been allowed to question the State's experts as to whether that diagnosis qualifies as a mental disorder under the SVP Act. However, he spends much of his argument discussing how OSPD nonconsent has been questioned as a valid diagnosis and the exclusion of the specific rape-related paraphilia from the DSM. He presents a circular argument that he should have been allowed to cross-examine the State's experts about the legitimacy of the OSPD nonconsent diagnosis while conceding that the diagnosis is generally accepted.

¶ 94    We reject respondent's assertion that he was hindered in his ability to challenge his diagnosis. While the trial court limited his cross-examination regarding the validity of OSPD nonconsent, respondent was permitted to challenge whether he personally had that mental disorder and whether the mental disorder was sufficient under the SVP Act. As discussed above, he devotes his argument only to the legitimacy of diagnosis in general, not as it relates to him. Here, respondent was able to challenge his own diagnosis through his expert, Dr. Kane. Dr. Kane recognized OSPD nonconsent and testified that she has diagnosed people with OSPD nonconsent. Her opinion in this case was that respondent did not suffer from that disorder, but rather his criminal offenses were a result of his antisocial personality disorder. Based on the facts before us, we cannot say that the trial court abused its discretion in limiting respondent's cross-examination.

¶ 95    Further, respondent did not make an offer of proof regarding what questions counsel intended to ask the State's experts about any limitations or controversy about the OSPD nonconsent diagnosis. "It is well recognized that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court." *People v. Andrews*, 146 Ill. 2d 413, 420-21 (1992).

¶ 96    "The two primary functions of an offer of proof are to disclose to the trial judge and opposing counsel the nature of the offered evidence, enabling them to take appropriate action,

and to provide the reviewing court with a record to determine whether exclusion of the evidence was erroneous and harmful." *People v. Thompkins*, 181 Ill. 2d 1, 10 (1998). The failure to make an adequate offer of proof results in forfeiture of the issue on appeal. *Andrews*, 146 Ill. 2d at 422. Absent an offer of proof, this court cannot thoroughly review respondent's claim. We are unable to review whether the proposed questions were appropriate and sufficiently probative that an abuse of discretion occurred. Since respondent failed to make an offer of proof, he has forfeited this claim on appeal. Moreover, the record on appeal established that respondent's counsel was able to effectively cross-examine both of the State's witnesses. Counsel elicited that neither Dr. Suire, nor Dr. Kuzia were involved in the treatment of sex offenders. During Dr. Suire's cross-examination, he disclosed that he had a brief interaction with respondent and respondent was calm and polite and he did not see any evidence of psychosis. Dr. Suire discussed that DSM-V and the SVP Act each has a definition of a mental disorder, and he admitted that there is "not perfect concordance between the terms mental disorder. That can be different." He explained that someone could have a clinical mental disorder, but not a legal mental disorder, or vice versa. Dr. Suire agreed that it was not necessary to have a mental disorder to engage in problematic sexual behaviors. Dr. Suire had never referred someone for SVP commitment based solely on the diagnosis of antisocial personality disorder or alcohol use disorder. Dr. Suire admitted that the rate for sex offenders reoffending was lower than the observed rates of recidivism for general criminality. Counsel questioned Dr. Suire extensively about his use of the Static 99-R and how the scores correlate to a risk to reoffend. He acknowledged that a score of 6 has a risk of reoffense of approximately 27% over 5 years and a risk of 41% over 10 years, while the risk of reoffense associated with a score of 5 is 21% over 5 years and approximately 32% over 10 years.

¶ 97    Dr. Kuzia also admitted during his cross-examination that one person raping another person does not necessarily indicate the presence of a paraphilic disorder and that a rape can occur in the absence of a paraphilic disorder. He believed that respondent's antisocial personality disorder is a congenital or acquired condition under the SVP Act and it affects respondent's emotional or volitional capacity. He agreed that antisocial personality disorder can remit over time, with aging being one reason for it to remit.

¶ 98    We additionally find that even if the trial court erred in limiting cross-examination, which we do not find, any error was harmless beyond a reasonable doubt. "In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). The State bears the burden of proof. *Id.* The supreme court has identified three different approaches for measuring error under this standard: "(1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *Id.*

¶ 99    Here, all of the experts, including respondent's expert, testified to the validity of the diagnosis of OSPD nonconsent. As discussed above, Dr. Kane, respondent's expert, testified that she has diagnosed people with OSPD nonconsent, but her opinion here was that respondent did not have this mental disorder. Respondent has conceded that the OSPD nonconsent diagnosis is admissible and has been recognized in multiple cases in Illinois. Given the

testimony about this diagnosis, we find any error in limiting testimony about the limitations or controversy about the diagnosis to be harmless beyond a reasonable doubt.

¶ 100    Finally, respondent argues that the trial court abused its discretion when it allowed the State to elicit irrelevant and prejudicial testimony regarding the statistics of the sex offender screening process for the Department of Corrections. The State responds that the trial court did not abuse its discretion in admitting brief testimony about the screening process.

¶ 101    During the State's qualification of Dr. Suire as an expert, the prosecutor asked him about the doctor's background in performing SVP evaluations. The following colloquy occurred.

> "THE PROSECUTOR: So how many then are referred in Illinois for commitment that you do?
>
> DR. SUIRE: The referral rate is usually two to two-and-a-half percent would be referred forward, so 97, 98 percent would not.
>
> DEFENSE COUNSEL: Objection.
>
> * * *
>
> THE COURT: Basis?
>
> MR. DANIELS: A Rule 213, Rule 214. May we have a sidebar.
>
> THE COURT: Sidebar."

¶ 102    At the sidebar, defense counsel argued that referral rates in Dr. Suire's testimony was not provided in discovery and that the screening rates would give the jury the impression that respondent was "by definition" an SVP because "he got through this super rigorous screening process." The prosecutor responded that Dr. Suire's qualifications were discussed at length in a deposition and counsel could have asked questions on the topic. The prosecutor also stated that Dr. Suire was not talking generally about statistics, but about his experience and what he has done. The prosecutor noted that respondent asked for the statistics to be barred, but not Dr. Suire's experience. The trial court overruled the objection and observed that the line of questioning was subject to cross-examination. When Dr. Suire's testimony resumed, he testified that of the cases he has been assigned to evaluate in Illinois, he has referred the majority of them to commitment proceedings. He also discussed his work on SVP cases in Missouri, where he referred very few cases. He explained the differences in the screening process in the states.

¶ 103    Under the Illinois Rules of Evidence, "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence which is not relevant is not admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). "Relevant evidence is that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Melcher*, 2013 IL App (1st) 123085, ¶ 42 (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)). The admission of evidence falls within the discretion of the trial court, and we will not reverse absent a showing of an abuse of discretion. *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 59.

¶ 104    Respondent contends that Dr. Suire's testimony about referral statistics in the sex offender screening process was irrelevant because the screening process was not part of the elements required under the SVP Act to determine whether respondent was an SVP.

¶ 105    Although respondent attempts to distinguish *In re Commitment of Dodge*, 2013 IL App (1st) 113603, we find it relevant here. In that case, the respondent argued on appeal that his trial counsel was ineffective for failing to object when the State remarked about the screening

process during opening statement and later when that information was elicited during the questioning of an expert witness. *Id.* ¶ 33. The reviewing court found the information was relevant to explain how the expert came to evaluate the respondent. *Id.* The *Dodge* court further found that even if the respondent's counsel should have objected, the respondent could not "demonstrate prejudice resulting from this minor deficiency." *Id.*

¶ 106    While the court in *Dodge* reviewed the similar claim in the context of ineffective assistance of counsel, the court's conclusion that the statistics evidence was relevant is helpful here. Similarly, Dr. Suire's testimony about the screening statistics arose in explaining his history and process in evaluating individuals under the SVP Act in Illinois compared to his history of SVP evaluations in Missouri. The brief testimony did not reference respondent and occurred while the State was qualifying Dr. Suire as an expert. Under these circumstances, we find the testimony was relevant as part of Dr. Suire's background and his qualifications as an expert in clinical and forensic psychology, specializing in SVP evaluations.

¶ 107    Both parties also refer us to cases from foreign jurisdictions. While we are not bound by these cases from other jurisdictions, we may look to them for guidance. *Neuhengen v. Global Experience Specialists, Inc.*, 2018 IL App (1st) 160322, ¶ 113. We find the Wisconsin decision in *In re Commitment of Sugden*, 795 N.W.2d 456 (Wis. Ct. App. 2010), to be most relevant here.

¶ 108    In that case, an expert witness was testifying about her experience, including performing " 'special purpose evaluations.' " *Id.* at 470. In explaining those evaluations, the expert effectively disclosed to the jury that "only 'a small number' of the total number of sex offenders facing release from prison are referred for a special purpose evaluation to determine whether the prisoner meets the criteria" for commitment. *Id.* The respondent argued that this information was irrelevant to set forth the expert's credentials or for the question of whether he was an SVP. *Id.* The reviewing court found the information about the screening process before a referral was irrelevant to the expert's background. *Id.* However, the *Sugden* court concluded that "this single reference in this case was not sufficient to deflect the jury's attention from a proper focus on the instructions defining a sexually violent person and the evidence relevant to that definition." *Id.* at 473.

¶ 109    In reaching its decision, the *Sugden* court considered a prior appellate court decision in *In re Commitment of Budd*, 742 N.W.2d 887 (Wis. Ct. App. 2007), which respondent also relies on in this case. In *Budd*, the State's expert testified that the respondent "was among only 4.5% of sex offenders selected for [SVP] proceedings." *Id.* at 893. Later, the State referred to this testimony in closing argument. *Id.* The reviewing court did not reach the question of whether the screening process for an SVP referral is "irrelevant as to the determination of whether a defendant is a sexually violent person as a matter of law." *Id.* at 892. The court found the information to be inadmissible because the evidence failed to explain why the respondent was chosen for a referral. *Id.* The court concluded the error was not harmless in that case where

> "the impact of telling the jury that the respondent was one of only 4.5% of sex offenders selected for [SVP] proceedings, where three of the four experts testified that the respondent did not meet the criteria of a sexually violent person, contributed to the jury's finding that [the respondent] is a sexually violent person." *Id.* at 893.

¶ 110    In this case, even if this testimony was not relevant, we would still find any error harmless. An error is harmless if the result would have been the same absent the error. *People v. Melton*, 2013 IL App (1st) 060039, ¶ 49. At trial, both Dr. Suire and Dr. Kuzia found respondent

- 21 -

suffered from OSPD nonconsent as well as antisocial personality disorder. Both testified extensively about how they reached their opinions. They each discussed their findings under the DSM-V and using actuarial instruments. Respondent presented Dr. Kane's testimony that he does not suffer from a paraphilia, but his actions arose from his antisocial personality disorder. All of the experts detailed respondent's progress in treatment, including his disclosure of numerous other victims and sex offenses beyond the convicted sex offenses. Given this extensive evidence, we cannot say that a single reference to the screening process during Dr. Suire's qualification testimony prejudiced respondent here. The reference did not highlight respondent and was not mentioned again in the proceedings. Accordingly, we find any error in its admission was harmless.

¶ 111    As in *Sugden*, we find the single reference was not sufficient to impact the jury's determination of whether respondent was an SVP. Thus, respondent's claim of error fails.

¶ 112    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 113    Affirmed.