2023 IL App (1st) 220168

No. 1-22-0168

Opinion filed December 26, 2023.

First Division

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF MICHAEL SEWELL, | ) | Appeal from the |
| | ) | Trial Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 06 CR 80015 |
| v. | ) | |
| | ) | |
| Michael Sewell, | ) | The Honorable |
| | ) | Steven G. Watkins, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**OPINION**

¶ 1     Following a jury trial, in 2021, respondent Michael Sewell, now age 70, was found to be

a sexually violent person (SVP) under the Sexually Violent Persons Commitment Act (Act) (725

ILCS 207/1 *et seq.* (West 2018)) and was committed to a secure facility in the Department of

Human Services for control, care, and treatment until such a time as he is no longer an SVP. See

*id.* § 40. Respondent appeals from that judgment, contending that (1) he was denied his

constitutional and statutory rights to a speedy trial; (2) the State's SVP petition was untimely;

(3) the trial court improperly precluded his expert psychologist from interviewing him, depriving

him of due process; (4) the trial court improperly admitted and relied on a psychiatric diagnosis that should have been subject to a *Frye* hearing (*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)); and (5) the court abused its discretion in limiting respondent's cross-examination of the State's expert witness. We affirm.

¶ 2                                     BACKGROUND

¶ 3                          A. *Respondent's Criminal History*

¶ 4      The record reveals a series of criminal offenses spanning decades, which inspired the State's civil commitment petition and also formed the basis for the expert trial testimony that respondent was an SVP. We briefly summarize that history here. In 1974, at age 21, respondent knocked on the back door of a woman's Chicago home, interrupting her phone conversation. The woman spoke with him and unlocked the door, and he barged into her apartment. He placed his hand around her neck and dragged her into the living room, where he raped her. Afterwards, he pushed her into the bathroom, ordered her to remain there, and threatened to kill her if she left. A jury found respondent guilty of deviate sexual assault, rape, and burglary.[1] On May 18, 1976, he was sentenced to 6 to 18 years' imprisonment for each of the respective crimes, to be served concurrently (No. 74-6845). Respondent later self-reported that he had experienced a sense of power and control over the woman on entering the apartment, creating sexual arousal, and this spurred the rape, although he had not originally planned to commit the crime.

¶ 5      While awaiting trial for the above offenses (No. 74-6845), respondent pried the screen off a window and escaped from county jail, then raped three different young women between the ages of 25 and 30, who were also strangers to him, in the summer of 1975. As to the first rape

---

[1]We note that the offense of rape was subsumed by the subsequently created offenses of criminal and aggravated criminal sexual assault. *In re Detention of Lieberman*, 201 Ill. 2d 300, 317-18 (2002). Rape qualifies as a sexually violent offense. *Id.*

(No. 75-6423), respondent knocked on a woman's back door and briefly engaged her in conversation about whether any apartments in the building were available. Respondent then broke into the same apartment, grabbed the woman's baby, and placed the baby down before he began choking the woman. He sexually assaulted her and told her that if she reported it, he would return and harm both her and her baby. As to the second rape (No. 75-5736), respondent broke into a young woman's house and attempted to strangle her while raping her and also threatened her afterwards. As to the third rape (No. 75-5735), respondent entered the back door of a woman's home, claiming he was a building janitor who would simply let himself out the front door. Instead, he picked up a kitchen knife and proceeded to rape the woman at knifepoint. On June 2, 1976, he pled guilty to all three rapes and was sentenced to 8 to 20 years (Nos. 75-6423, 75-5736, 75-5735), to be served concurrently, along with his 1974 sexual assault and burglary convictions (No. 74-6845). He also pled guilty to escape and was sentenced to one to five years (No. 75-6906), to be served concurrently with the rape cases.

¶ 6    In 1984, after having served 7½ years in prison, respondent was released on parole. Some two years later, in February 1986, while on parole, respondent broke into a woman's apartment through the screen door or window and attacked her while she was sleeping. He punched her in the face and attempted to get on top of her while she physically resisted. Respondent continued to punch her, and she fell off the bedside. He got on top of her and had taken down his pants, unzipping them, when she screamed. Respondent then fled while a police officer came through the back door. The officer apprehended him with his pants still unzipped at his knees. The victim suffered multiple lacerations to her mouth and lips, stitches, scar tissue, two black eyes, and nerve damage. Respondent was convicted of home invasion, aggravated battery, and residential burglary. On October 7, 1986, he was sentenced to 40, 15, and 10 years

for the respective crimes (No. 86-CR-2275), to be served concurrently. Although charged, he was found not guilty of attempted aggravated criminal sexual assault. Nonetheless, respondent later reported that when he committed this crime, "he thought he had cured himself and had it under control and apparently he didn't."

¶ 7 In October 1986, respondent was found to have violated parole in his 1976 convictions (Nos. 74-6845, 75-5736, 75-6423) due to the aforementioned offenses. He served the remainder of his sentences on the 1976 sexually violent convictions while also in prison for the 1986 non-sexually violent convictions of home invasion, residential burglary, and aggravated battery (No. 86-CR-2275).

¶ 8 In 2005, respondent, by then in his early fifties, was released on a three-year mandatory supervised release (MSR) term for his 1986 case. While on MSR, he was ordered to follow various conditions, participate in sex offender treatment, and also electronically monitored. In 2006, he allegedly violated MSR, he was imprisoned, a parole violation report was filed, and a hearing was held. The Prisoner Review Board, part of the Department of Corrections, found he had violated his MSR conditions by possessing some 451 pornographic images depicting women between the ages of 25 and 30, the same as his previous victims. Respondent had also been terminated from sex offender treatment for failure to participate. The violation report recommended that respondent be evaluated for SVP status and serve the remainder of his MSR term in an institution. In September 2006, the Prisoner Review Board ordered that respondent reenter MSR when plans were approved.

¶ 9                    B. *The State's SVP Petition*

¶ 10 A month later, on October 5, 2006, the State filed a petition to commit respondent as an SVP under the Act based on his past sex offenses, mental illness, and probability of reoffense.

Attached to and incorporated into its petition was an evaluation completed in August 2006 by Dr. Ray Quackenbush, an independent psychologist contracted by the Department of Corrections. Dr. Quackenbush interviewed respondent in-person at Stateville Correctional Center for approximately three and a half hours. In the evaluation, Dr. Quackenbush diagnosed respondent with paraphilia not otherwise specified (PNOS), which later became known as other specified paraphilic disorder (OSPD), nonconsent, and antisocial personality disorder.[2] He opined there was a substantial probability that respondent would engage in future acts of sexual violence. Dr. Quackenbush therefore recommended respondent be found an SVP under the Act and subject to civil commitment. The following day, October 6, 2006, respondent's MSR plan was approved, and pursuant to the court's detention order, he was transferred to the custody of the Department of Human Services to also serve the remainder of his MSR term. See 725 ILCS 207/30(a) (West 2006) (noting a circuit court must review the SVP petition and detain the person if there is cause to believe he is an SVP).

¶ 11    A probable cause hearing ensued on November 8, 2006. See *id.* § 30(b). At the hearing, Dr. Quackenbush testified as to many of the above-stated crimes. He again opined that respondent's mental disorders predisposed him to commit acts of sexual violence and that respondent was "substantially probable to engage in acts of sexual violence" in the future. The trial court agreed, and respondent was ordered to be further evaluated. At respondent's request, Dr. Larry Davis was appointed to evaluate him.

¶ 12                             C. *Pretrial Litigation*

---

[2]OSPD was previously classified as PNOS in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition. *In re Commitment of Brown*, 2021 IL App (1st) 191606, ¶ 91 n.2. For ease of reference, we use OSPD, as reflected in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. *In re Commitment of Adams*, 2021 IL App (1st) 182049, ¶ 53; *In re Detention of Hayes*, 2015 IL App (1st) 142424, ¶ 30.

¶ 13    Years of pretrial litigation ensued, which we detail due to respondent's speedy trial claim on appeal. In February 2007, respondent filed a motion to dismiss the case, citing section 15 of the Act, which provided in relevant part that an SVP petition must be filed "no more than 90 days before discharge or entry into mandatory supervised release from a Department of Corrections correctional facility *** for a sentence that is being served concurrently or consecutively with a sexually violent offense." See *id.* § 15. Respondent argued that he was not serving a sentence that was concurrent with or consecutive to a sexually violent offense and that the October 6, 2006, petition to commit him as an SVP was prematurely filed, as it was not filed within 90 days of his 2008 discharge date from the Department of Corrections. He argued he was never actually released on MSR because there were no records of his reentry into MSR before transfer to the Department of Human Services.

¶ 14    Respondent submitted to the court a discovery deposition of Ona Welch, the Department of Correction's assistant chief records officer, along with exhibits including various prison records. Welch's combined testimony on direct and cross-examination revealed that, for a time, respondent was serving a simultaneous or concurrent prison sentence for his 1974/1975 sex offenses, as well as for his other 1986 criminal offenses.

¶ 15    Welch further testified that on September 19, 2006, the Prisoner Review Board found respondent had violated MSR from his 1986 convictions in spring 2006. The Prisoner Review Board ordered respondent, who was in physical custody, to be released back into MSR when his parole plan was approved. Welch testified that respondent's parole plan was approved on October 6, 2006, when he was transferred to the Department of Human Services' host site. There, he was to serve the remainder of his MSR term for the 1986 convictions under the same

MSR conditions as when he was originally released.[3] She explained that it was the Department of Corrections that decided on placement at the host site. Notably, as of October 5, 2006, when the State filed its SVP petition against respondent, the parole plan had not been approved because no host site had been found for respondent. Moreover, Welch noted that as of October 5, 2006, respondent's discharge date for the 1986 convictions was August 7, 2008. Once he formally reentered MSR on October 6, 2006, a new discharge date was recalculated (due to the parole violation) to September 19, 2008.

¶ 16    In February 2008, the trial court denied respondent's motion to dismiss. In its written order, the court credited Welch's testimony that respondent reentered MSR in the Department of Human Services' custody on October 6, 2006. The court declared this was within one day of the State's filing the SVP petition, thereby making it timely under the statute. The court noted the recalculation of respondent's discharge date also reflected that he formally reentered MSR on October 6. Further, the court determined that, in accordance with the statutory requirements and Illinois case law, respondent was serving a sentence concurrently with a sentence for a sexually violent offense when the State filed its petition. The court observed that respondent committed the 1986 non-sexually violent offenses while he was on MSR for his sexually violent offense convictions, he was returned to the Department of Corrections custody, and then was sentenced on the new 1986 offenses while time remained on his sentences for sexually violent offenses. The State had no reason to seek civil commitment until respondent reentered MSR for the non-sexually violent convictions from 1986.

¶ 17    Following that denial, in September 2008, respondent's attorney filed a motion to withdraw, citing respondent's hostile conduct. The motion asserted respondent denigrated

---

[3]Welch testified that the MSR agreement, which respondent originally signed, was part of his master file. It does not appear in the record before us.

counsel, then followed him while on a "tirade," necessitating guards to escort respondent away. In the motion, counsel noted that respondent's evaluator, Dr. Davis, had died and respondent was essentially refusing further evaluation. Respondent obtained new counsel, Daniel T. Coyne and Michael Johnson of Chicago-Kent College of Law.[4] In the summer and fall of 2009, respondent filed a motion for *writ of habeas corpus* before the court, which counsel then agreed to examine, although the record does not reveal what came of the motion.

¶ 18    Four years after the original motion to dismiss was filed and several months after the parties announced they would set the case for trial, new counsel filed another motion to dismiss on behalf of respondent in September 2011, again claiming the SVP petition was not timely filed under section 15 of the Act. See 725 ILCS 207/15 (West 2006); *In re Commitment of Sewell*, 2014 IL App (1st) 132151-U, ¶ 7. The State moved to strike the motion as duplicative, and in response, respondent claimed that neither his 2007 motion, nor the court's order, considered that "the SVP petition itself was the mechanism used to effect the approval of parole plans and fictitiously create a parole out-date." *Sewell*, 2014 IL App (1st) 132151-U, ¶ 7. In November 2012, the court again denied respondent's motion, concluding the State's petition was timely filed within 90 days of respondent's actual entry into MSR, consistent with the Act and our supreme court law.

¶ 19    Respondent subsequently sought leave to file an interlocutory appeal under Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010), and the State opposed it, arguing the issue did not qualify under Rule 308 because there was no ground for substantial difference of opinion and the appeal would not materially advance the termination of litigation, as required. The State added

---

[4]At some point in the proceedings, Johnson eventually started his own practice but continued representing respondent as the primary attorney. There is no evidence that Coyne withdrew from representation.

that the case was nearly ready for trial. The trial court granted the motion in July 2013, noting in response to the State's inquiry that it did not want the parties to proceed with depositions and other discovery. Respondent did not object.

¶ 20    The trial court certified two questions, querying whether the petition was timely and whether it should be dismissed. In February 2014, this court dismissed the appeal, as improvidently granted. See *Sewell*, 2014 IL App (1st) 132151-U, ¶ 11, 17. Noting that Rule 308 should be limited to " 'exceptional' circumstances," and "sparingly exercised," this court found the certified questions, as worded, did not qualify for consideration under Rule 308. *Id.* ¶¶ 11-14. This court nonetheless found that the case had been pending since mid-2000, well past the suggested statutory trial date and well past respondent's September 19, 2008, discharge date from the Department of Corrections, and it "would therefore behoove the court and the parties to expedite the matter." *Id.* ¶ 15.

¶ 21    The parties did not do so. Subsequently, years of litigation followed. Between July 2014 and December 2018, the parties litigated the appointment of psych evaluators, the respondent's motion for a *Frye* hearing, and competing discovery matters. More specifically, in July 2014, respondent moved for a current evaluation (the last was done in 2009) and requested the appointment of a new evaluator since his, a Dr. Paul Heaton, had moved from Illinois. The State objected to a new evaluator, surmising it was because the prior evaluation was unfavorable to respondent. The court permitted an updated evaluation by the same evaluator. In November 2014, the State moved to confine the evaluation to "records only" because respondent had declined to speak to the doctors following his probable cause hearing and was only ever interviewed in person by Dr. Quackenbush, who had retired, while respondent was in prison. The court granted this motion, and a year later in July 2015, respondent moved for reconsideration,

arguing respondent also should be permitted to speak to his own evaluator, Dr. Heaton. The court denied respondent's motion for reconsideration, citing the language of section 30(c) of the Act (725 ILCS 207/30(c) (West 2014)) but ruled, over the State's objection, that the evaluator could interview other individuals identified within the records. Ultimately, in December 2015, respondent announced his expert, Dr. Heaton, would not be tendering a report.

¶ 22    Meanwhile, in June 2015, after a joint hearing with various SVP respondents, the court denied respondent's January 2015 motion for a *Frye* hearing, finding contrary to respondent's contention that Illinois case law resoundingly supported that OSPD, respondent's diagnosed mental disorder, was generally accepted in the scientific community.

¶ 23    In May 2016, the State announced that one of its evaluators, Dr. Diana Dobier, would be retiring within days, and its motion to replace her was granted. In July 2016, respondent claimed Dr. Dobier was still available. Months later, in September 2016, respondent moved to vacate the court's ruling granting the State a new evaluator. The State asked for time to respond. In November 2016, as a result, the Department of Human Services sought to intervene, which the court denied in April 2017. Respondent moved to continue the matter. In May and June 2017, respondent argued that Dr. Dobier had not in fact retired and insinuated the State was engaging in delay and gamesmanship. During this time, respondent sought to compel e-mails and documents to determine when the State became aware of Dr. Dobier's employment status, and the State ultimately complied, although the parties spent months bickering over what could be produced.[5] The State also responded that Dr. Dobier was no longer a Department of Human Services evaluator as of May 2016, but rather was employed by a private company. Regardless

---

[5]The court ultimately denied respondent's request to compel additional documents from the Department of Human Services or Dr. Dobier's private employer, as they were not parties to the action. At some point, respondent also requested to call witnesses in support of his motion to reconsider the court's order granting a new evaluator.

of her status, she could not conduct the SVP evaluations or testify in court under the Act. The State denied any bad faith on its part. This matter was continued by agreement until March 2018, two years after the State filed its original motion to replace Dr. Dobier. At that time, the court denied respondent's motion to reconsider after noting Dr. Dobier's employment status was irrelevant to whether respondent was an SVP and the Act permitted a new evaluator.

¶ 24    Over the spring and summer of 2018, the parties litigated other discovery matters. Respondent filed a request to produce, seeking transcripts of prior cases in which the State's expert witnesses testified. Respondent argued this was relevant for possible impeachment of the witness during trial. Respondent further argued he had complied with the State's identical discovery request. The State countered that respondent had no expert, so "there [was] nothing for him to provide." The State added that respondent was free to order transcripts or take expert depositions, but it was too burdensome for the State to cull through all their files, as they did not maintain a "bank of transcripts." The court therefore suggested respondent obtain the information it sought via interrogatories or depositions.

¶ 25    Respondent subsequently sought five years' worth of records, including time sheets and invoices, from the State's experts as to the cases in which they testified, noting in response to the court's query, that "five years was just a number we picked." The State observed that the case was 12 years old, and respondent had already deposed their expert, Dr. Barry Leavitt, in 2011. Given that Dr. Leavitt had other clients in his clinical practice, respondent's request would necessitate that Dr. Leavitt collect five years of billing from the Attorney General's office, State of Illinois, and Department of Corrections, which would take "an incredible amount of time." The State questioned how this was even relevant to whether respondent was an SVP. Respondent argued he needed the information to order transcripts of testimony from all the cases of the

expert for the purposes of identifying any contradictory testimony. The court held that five years was overburdensome and it was not convinced of the relevancy. It ruled respondent could subpoena one year's worth of documents, and Dr. Leavitt complied. At a subsequent hearing, respondent asked for one more year worth of documents, but the court noted the motion had already been argued and denied the request.

¶ 26    Finally, in December 2018, the parties discussed a possible July 2019 trial date, although it had to be moved due to the unavailability of the State's expert. In January 2019, they set the case for a jury trial in August 2019. Meanwhile, discovery continued. Respondent deposed the State's other expert witness in the spring and filed a "renewed motion to dismiss," his third, which was ultimately denied. Other matters, including motions *in limine*, respondent's motion, and proposed jury questions, were to be handled on August 13, 2019, but the hearing was delayed because the judge overseeing trial had two family funerals to attend.

¶ 27    On August 19, 2019, the parties answered ready for the jury trial, although respondent waived his right to be present in court, stating "I am not going cause I don't want to go." Respondent had declined to appear in court on his case starting in 2010. The parties then argued the motions *in limine*, among other things, and the court ruled on them. Respondent filed a motion *in limine* seeking to preclude testimony about his mental diagnosis of OSPD, essentially renewing his motion for a *Frye* hearing. This was denied.[6] The State moved to file an amended SVP petition with the updated evaluations and certified copies of conviction. Although the court granted the motion, it noted that respondent had not waived his right to be present for a jury trial on the State's amended petition. Defense counsel did not object, and the parties agreed to continue the cause to the next day, so that counsel could confer with respondent.

---

[6]Respondent later filed a motion to reconsider the denial of this motion *in limine*, his third on the subject of urging a *Frye* hearing as to OSPD. That, too, was denied.

¶ 28    On August 20, 2019, the State announced that due to the previous days' arguments and the parties' inability to select a jury, the State's witness was unavailable. The State requested a short continuance. For the first time, respondent objected to the continuance. Prior to this day, respondent had effectively agreed to all continuances during his institutionalization. The court observed that as to the proposed August 19 trial date,

> "all parties believed that we could, in fact, do those pre-trial matters and still pick [a jury] and put on at least one witness yesterday. We had a heavy call. The motions *in limine* took a little longer, and the motion to dismiss took a little longer than we thought. So here we are. I don't believe there is any attempt to delay the matter for any less than valid reasons. So I will grant the State's motion for a continuance."

The parties then reserved a trial date of February 3, 2020, as that was the first available for both the lawyers and witnesses.

¶ 29    At a status date on August 29, 2019, respondent announced that February 3, 2020, was untenable for him, and the only date available for all parties and the judge for a three-day jury trial was May 4, 2020. Respondent's counsel stated, "[m]y schedule is full. There's a lot of backlog in the SVP cases. So unfortunately that's by agreement."

¶ 30    On January 6, 2020, despite previously having agreed to the May trial date, respondent entered a written demand for trial and objected to any further continuance. Respondent then filed a motion to dismiss for a constitutional speedy trial violation, and on March 9, 2020, the parties argued the matter. The court noted it needed time to review the motion, and the case was continued by agreement to April 7. Nevertheless, in March and April 2020, the COVID-19 pandemic took quite a hold of the public and U.S. court system.

¶ 31 On March 17, 2020, the Illinois Supreme Court entered an order in response to the pandemic, which by then had been declared a national emergency. Ill. S. Ct., M.R. 30370 (eff. March 17, 2020). To protect the health and safety of court patrons, staff, judges, and the general public, the order directed courts to implement "temporary procedures to minimize the impact of COVID-19 on the court system, while continuing to provide access to justice." *Id.* The order declared that only essential matters and proceedings would be heard and, if possible, remotely. On March 20, 2020, the supreme court issued another order, authorizing the chief judges of each circuit to continue trials for the next 60 days and until further order. Ill. S. Ct., M.R. 30370 (eff. Mar. 20, 2020). The court noted that any resultant delay in criminal proceedings would not be attributable to the State or the defendant under the speedy trial statute. See 725 ILCS 5/103-5 (West 2018).

¶ 32 On April 3, 2020, the supreme court amended the March 2020 order to state, "[t]he Chief Judges of each circuit may continue trials until further order of this Court," and again reiterated its speedy trial declaration. Ill. S. Ct., M.R. 30370 (eff. Apr. 3, 2020). On April 7, the supreme court issued another amended order, which provided:

> "The Chief Judges of each circuit may continue trials until further order of this Court. The continuances occasioned by this Order serve the ends of justice and outweigh the best interests of the public and defendants in a speedy trial. Therefore, such continuances shall be excluded from speedy trial computations contained in section 103-5 of the Code of Criminal Procedure of 1963 [citation] and section 5-601 of the Illinois Juvenile Court Act [citation]. *Statutory time restrictions in section 103-5 of the Code of Criminal Procedure of 1963 and*

14

*section 5-601 of the Juvenile Court Act shall be tolled until further order of this*

*Court*." (Emphasis added.) Ill. S. Ct., M.R. 30370 (eff. Apr. 7, 2020).

The supreme court went on to issue amended orders excluding, in total, the entire period between March 20, 2020, and October 1, 2021, from speedy trial computations. See Ill. S. Ct., M.R. 30370 (eff. June 30, 2021). The Cook County circuit court also issued a series of general administrative orders establishing that delays due to the pandemic were excluded from speedy trial calculations during that entire period.[7]

¶ 33    Following the aforementioned COVID-19 delays, in September 2020, the trial court denied respondent's motion to dismiss on constitutional speedy trial grounds. The court reasoned that a "large part of the delay is attributable to [respondent]," as his "motions to dismiss, interlocutory appeal, motion for a *Frye* hearing, and other pretrial litigation extended the time to bring this matter to trial." Further, the "discovery process also appears to account for a

---

[7]The Cook County circuit court general administrative orders spoke more specifically to trial court delays in Cook County. See Cook County Cir. Ct. Gen. Adm. Order 2020-01 (March 17, 2020) (all matters continued, no new jury trials); Cook County Cir. Ct. Gen. Adm. Order 2020-01, § 3(d) (April 3, 2020) (delays caused not attributable to State for speedy trial and other purposes); Cook County Cir. Ct. Gen. Adm. Order 2020-01 § 3(c) (May 28, 2020) (delays caused not attributable to State for speedy trial and other purposes); Cook County Cir. Ct. Gen. Adm. Order 2020-02, § 1(a)(vii), (c)(iii) (June 26, 2020) (no new jury trials and "[w]hen jury trials resume, the judge presiding shall schedule jury trials not less than 60 days after the date on which the parties are notified of the trial date" and "[a]ny delay resulting from this order or from Cook County Cir. Ct. G.A.O. 2020-01 (eff. Mar. 17, 2020, and as subsequently amended) shall not be attributable to either the State or the defendant for purposes of section[ ] 103-5 (speedy trial) of the Code of Criminal Procedure of 1963"); Cook County Cir. Ct. Gen. Adm. Order 2020-02, § 1(a)(vii), (c)(iii) (Aug. 21, 2020) (same); Cook County Cir. Ct. Gen. Adm. Order 2020-02, § 1(a)(vii), (c)(iv) (Sept. 21, 2020) (same); Cook County Cir. Ct. Gen. Adm. Order 2020-02, § 1(a)(vii), (c)(iv) (Oct. 16, 2020) (same); Cook County Cir. Ct. Gen. Adm. Order 2020-07, § 1(a)(v), (c)(vii) (Nov. 23, 2020) (same but also adding reference to 2020-02 regarding delays and noting, "[n]o bench trials in criminal cases and no jury trials of any kind shall be held until further order of the court"); Cook County Cir. Ct. Gen. Adm. Order 2020-07, § 1(a)(iv), (c)(vii) (Mar. 23, 2021) (jury trials to begin, limited to certain courthouses "resources and public health guidelines permitting, at the discretion of the judge presiding *** consistent with Ill. S. Ct., Illinois *** M.R. 30370," and days tolled for speedy trial computations); Cook County Cir. Ct. Gen. Adm. Order 2020-07, § 1(a)(iv) (Apr. 23, 2021) (jury trials limited to certain courthouses "resources and public health guidelines permitting, at the discretion of the judge presiding . . . consistent with Ill. S. Ct., Illinois . . . M.R. 30370").

significant part of the delay." The court found that while "the reasons for the long delay do not provide a concise explanation," it did not "find that any of the delay was occasioned by the State's intent to gain some tactical advantage," nor could it find "that [respondent] hasn't used delay as a tactic for his own advantage." The court noted that respondent agreed to continuances and did not demand trial until recently. And, last, the court found respondent had not established prejudice.

¶ 34    Respondent filed another motion to dismiss in March 2021, alleging a violation of his speedy trial rights based on statutory grounds. This was denied in April 2021. Throughout this period in 2020 and 2021, respondent continued to demand trial, even as the court noted that no jury trials were being conducted at that time "via order." The court stated that there was a "Supreme Court order, which I am not going to violate." In June 2021, the court announced that only one trial would be held per day and that SVP cases were low in priority compared to serious criminal cases.

¶ 35                              D. *Trial*

¶ 36    A three-day jury trial began on August 30, 2021. Respondent was not present at trial and did not present any evidence. Dr. Leavitt and Dr. Richard Travis testified for the State as clinical and forensic psychology experts with specialties in SVP evaluations, diagnosis, and risk assessment. The doctors' assessments were based solely on review of the records and risk assessment, as respondent refused to participate in treatment and evaluation. Dr. Leavitt delineated respondent's various violent sex offenses and resultant convictions set forth above. Both experts concluded that respondent met the statutory criteria for commitment as an SVP, had a qualifying mental disorder of OSPD, and as a result was substantially probable to engage in acts of sexual violence, thereby posing a danger. See 725 ILCS 207/15(b) (West 2018). They

16

explained that his OSPD involved recurrent sexual urges, fantasies, and behaviors towards nonconsenting females, with the sexual arousal being linked to coercive force or violence against the women. It was also noted at trial that throughout respondent's institutionalization under the Act, he had refused to participate in any treatment.

¶ 37    Following a dispositional hearing on January 31, 2022, respondent was committed to a secure facility in the Department of Human Services' custody. He appealed.

¶ 38                                    ANALYSIS

¶ 39    The Act is intended "to keep our communities safe from predatory sex offenders who pose an ongoing threat to our citizens." (Internal quotation marks omitted.) *In re Detention of Powell*, 217 Ill. 2d 123, 138 (2005). To that end, the Act provides that the State may file a petition to civilly commit predatory sex offenders to the care and custody of the Department of Human Services before their discharge, entry into MSR, or after their entry into MSR from the Department of Corrections. 725 ILCS 207/15 (West 2018). Indeed, as in this case, the Department of Corrections must inform the State of defendants in its custody who are convicted of sexually violent offenses and who may be SVPs before the defendants are released into MSR. *Id*. § 10. An SVP is generally defined as one who has been convicted of a sexually violent offense and is dangerous because "he suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence" *Id*. § 5. On the filing of a petition, the trial court must hold a hearing to determine whether there's probable cause to believe the named individual is an SVP; if so, the person must be taken into custody of the Department of Human Services for further evaluation. *Id*. § 30. The statute envisions a timely trial by judge or jury must then ensue, as delineated further below. *Id*. § 35. The State has the burden of proving the allegations in the petition beyond a reasonable doubt. *Id.* The respondent

also has the right to be present and represented by counsel (or appointed counsel if indigent), to remain silent, to present and cross-examine witnesses, and to have a hearing recorded by a court reporter. *Id*. § 25(c).

¶ 40                                    A. *Speedy Trial*

¶ 41    Respondent first contends the State violated his right to a speedy trial, where he was in the custody of the Department of Human Services on a probable cause finding for almost 15 years before trial. He maintains the trial court erred in denying his motions to dismiss on speedy trial grounds.

¶ 42    The right to a speedy trial is fundamental and guaranteed to a criminal defendant under both the sixth amendment and the due process clause of the federal constitution (U.S. Const., amends. VI, XIV) and by article I, section 8, of our state constitution (Ill. Const. 1970, art. I, § 8). *People v. Mayfield*, 2023 IL 128092, ¶ 18. Respondent acknowledges that proceedings under the Act are civil in nature but nonetheless contends the constitutional right to a speedy trial still applies to SVPs given that the proceedings can result in a deprivation of liberty and institutionalization for psychiatric or psychological treatment. See 725 ILCS 207/20 (West 2018). We agree. See *In re Commitment of Conley*, 2023 IL App (1st) 211084, ¶ 20 (finding SVP respondents have a federal constitutional right to a speedy trial); see also *People v. Trainor*, 196 Ill. 2d 318, 329, 336 (2001) (finding a respondent subject to the Sexually Dangerous Persons Act (Sexually Dangerous Act) (725 ILCS 205/0.01 *et seq.* (West 1998)) has a due process right entitling him to a speedy trial, among other rights, and noting the similar goals and legislative intent between the Act and the Sexually Dangerous Act).

¶ 43    We further observe that the legislature has conferred an additional speedy-trial right in section 35 of the Act, which specifies time periods within which an accused SVP must be brought to trial. See 725 ILCS 207/35 (West 2018). The statute specifically provides:

"A trial to determine whether the person who is the subject of a petition under Section 15 of this Act is [an SVP] shall commence no later than 120 days after the date of the probable cause hearing under Section 30 of this Act. Delay is considered to be agreed to by the person unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record. Delay occasioned by the person temporarily suspends for the time of the delay the period within which a person must be tried. If the delay occurs within 21 days after the end of the period within which a person must be tried, the court may continue the cause on application of the State for not more than an additional 21 days beyond the period prescribed. The court may grant a continuance of the trial date for good cause upon its own motion, the motion of any party or the stipulation of the parties, provided that any continuance granted shall be subject to Section 103-5 of the Code of Criminal Procedure of 1963." *Id.*

¶ 44    Although respondent possesses both a constitutional and statutory right to a speedy trial, the rights are not coextensive. See *Mayfield*, 2023 IL 128092, ¶ 39. Because respondent alleges both, we address each in turn.

¶ 45                              i. Statutory Right to Speedy Trial

¶ 46    Although it is the State's duty to bring a respondent to trial, the respondent bears the burden of affirmatively establishing a statutory speedy-trial violation; he must show that the delay was not attributable to his own conduct. *People v. Kliner*, 185 Ill. 2d 81, 114 (1998); see also 725 ILCS 207/35 (West 2018) (providing that "[d]elay is considered to be agreed to by the

person unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record. Delay occasioned by the person temporarily suspends for the time of the delay the period within which a person must be tried"). In addition, while we defer to the trial court's determination as to who is responsible for the trial delay, and we will sustain that determination absent a clear abuse of discretion, we review *de novo* the ultimate question of whether the respondent's statutory right was violated. *Kliner*, 185 Ill. 2d at 115; *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 56.

¶ 47    As to respondent's statutory speedy trial claim, we first observe that respondent's probable cause hearing took place on November 8, 2006. Following the testimony of Dr. Quackenbush, the trial court found there was probable cause to believe respondent suffered from OSPD and antisocial personality disorder, both mental disorders, which made him substantially probable to reoffend. Under the statute, respondent's trial was to be held within 120 days following the probable cause hearing (or by March 8, 2007). That did not occur. Yet, respondent did not file a written demand for trial until January 6, 2020 (although it's worth noting he had previously agreed to a May 4, 2020, trial date because his counsel's schedule was "full" due to "backlog in the SVP cases"). This was 13 years after his probable cause hearing. Until that time, respondent had agreed to all but one continuance. Accordingly, this delay was attributable to respondent, and we begin our statutory speedy trial analysis by counting down 120 days from the written trial demand. However, our analysis does not go far.

¶ 48    Three months after respondent filed his written demand for trial, in March 2020, due to the COVID-19 pandemic, the Cook County circuit court suspended holding new jury trials, and the Illinois Supreme Court issued a series of emergency orders tolling the time for speedy trial computations until October 1, 2021. See *Mayfield*, 2023 IL 128092, ¶¶ 6-9. Respondent's trial

began on August 30, 2021. In rejecting respondent's motion to dismiss his case on speedy trial statutory grounds, the trial court specifically held that pandemic-related court orders applied to SVPs under the Act, thus tolling the statutory period. The court also implicitly, if not expressly, found the orders and pandemic provided "good cause" to continue the case. See 725 ILCS 207/35 (West 2018). At most, the delay attributable to the State would have been 74 days (from January 6, 2020, to March 20, 2020, when the supreme court issued its order).[8] See *People v. Ballard*, 2022 IL App (1st) 210762, ¶ 38 (finding the COVID-19 emergency court orders tolled the defendant's speedy trial term).

¶ 49    Respondent nonetheless insists his case should have been heard during this period. He notes that the supreme court order (dated March 17, 2020) stated that "[e]ssential court matters and proceedings shall continue to be heard by the Illinois courts." Ill. S. Ct., M.R. 30370 (eff. Mar. 17, 2020). He further notes a general administrative order of the circuit court of Cook County (effective March 17, 2020), declared that mental health hearings would "continue as scheduled." Cook County Cir. Ct. Gen. Adm. Order 2020-01 (Mar. 17, 2020). We reject these arguments for several reasons.

¶ 50    First, respondent has not sustained his burden of establishing that, given his long-time institutionalization on a probable cause finding, a jury trial to determine whether he had a mental illness making him an SVP was an essential court matter or proceeding during the pandemic. Second, respondent has not established that his *jury trial* was the equivalent of a *mental health hearing*. Plus, as the trial court noted in its order rejecting his motion to dismiss, the SVP petitions are filed and proceed in the criminal division of the circuit court of Cook County.

---

[8]Before the trial court, the State conceded that the period from January 7, 2020, to February 25, 2020, was attributable to the State.

¶ 51    Respondent also complains that none of the pandemic-related court orders referenced the speedy trial provision, section 35, of the Act. He argues the orders thus did not apply to SVPs. The State counters that section 35 of the Act provides that any continuances granted are subject to section 103-5 of the Code of Criminal Procedure of 1963 (Code) and observes that the pandemic orders expressly referenced section 103-5 of the Code. 725 ILCS 207/20, 36 (West 2018) (noting the provisions of civil practice apply except as otherwise provided in the Act). The State maintains that the pandemic orders therefore also encompassed the speedy trial provision under the Act. We would tend to agree. During the pandemic, jury trials in Cook County were suspended, including those in the criminal court, and the resultant delays excluded from speedy trial computations in the Code. Here, the trial court found "it would be unreasonable to believe that the restriction on holding jury trials applied only in criminal matters and not SVP cases." See *Lieberman*, 201 Ill. 2d at 319-20 (declining to read a statute in an absurd manner that would prejudice the public interest in keeping citizens safe from violent sexual offenders).[9]

¶ 52    However, regardless, respondent has not established that the trial court's finding of good cause for the continuances due to the pandemic was in conflict with section 103-5 of the Code. If a world-wide pandemic does not provide "good cause" to toll the speedy trial computations under the Act, then we do not know what would. Respondent has not offered an alternative reading of the statute in his opening brief. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued are forfeited and shall not be raised in the reply brief). Based on the foregoing, we cannot say the court's findings were an abuse of discretion or that its denial of the speedy trial

---

[9]In arguing that the supreme court orders tolling the speedy trial provisions do not apply to him, respondent emphasizes that the Act is civil in nature. We find this argument somewhat ironic given that respondent also argues that constitutional protections involving speedy trials for criminal defendants *do apply to him*, and he acknowledges that respondents are entitled to many of the same protections as criminal defendants.

motion was incorrect. See *People v. Smith*, 2012 IL App (1st) 113591, ¶ 23 (noting, an abuse of discretion occurs where no reasonable person could agree with the trial court's decision).

¶ 53                              ii. Constitutional Right to Speedy Trial

¶ 54    Next, we turn to respondent's claim that his constitutional right to a speedy trial was violated. When analyzing that matter, Illinois courts consider four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530-33 (1972): (1) whether the delay before trial was uncommonly long, (2) whether the government or the respondent is more to blame for the delay, (3) whether in due course the respondent asserted his right to a speedy trial, and (4) whether he suffered prejudice as a result of the delay. *Conley*, 2023 IL App (1st) 211084, ¶ 21; *People v. Davila*, 2022 IL App (1st) 190882, ¶ 79. All four factors are closely related, and no factor is singularly dispositive. *People v. Crane*, 195 Ill. 2d 42, 52 (2001); *Davila*, 2022 IL App (1st) 190882, ¶ 79.

¶ 55    Accordingly, each factor must be weighed and considered in light of the circumstances of the case as reflected by an examination of the entire record. *Barker*, 407 U.S. at 522; *People v. O'Quinn*, 339 Ill. App. 3d 347, 354 (2003). The respondent need only show that the delay was not attributable to his conduct, and the State bears the burden of justifying any delay that has occurred. *Crane*, 195 Ill. 2d at 53; *People v. Belcher*, 186 Ill. App. 3d 202, 206 (1989). Reasons for the delay are accorded different weight. *Crane*, 195 Ill. 2d at 53. Evidence that the State intentionally delayed prosecution to gain some tactical advantage will weigh heavily against the State, while neutral reasons, such as a crowded court docket, faulty police procedure, negligence, or incompetence, will weigh less heavily. *Id.* When resolving a constitutional speedy-trial claim, any factual determinations made by the trial court will be upheld on review unless they are against the manifest weight of the evidence. *Id.* at 51. However, we review *de novo* the ultimate determination of whether a defendant's constitutional speedy-trial right has been violated. *Id.* at

52. Because the remedy for a constitutional speedy trial violation generally requires the accused to go free, the right to a speedy trial should always be balanced and consistent with the public right to justice. *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 66.

¶ 56    As set forth, when assessing a constitutional speedy-trial claim, the first consideration is the length of the delay. Generally, courts recognize that a delay of one year is "presumptively prejudicial." *Crane*, 195 Ill. 2d at 52-53. This does not mean that respondent was in fact prejudiced, however. *O'Quinn*, 339 Ill. App. 3d at 354. Rather, a "presumptively prejudicial" time period will only trigger the full *Barker* inquiry involving the aforementioned factors. *Id.*

¶ 57    In this case, the length of delay—nearly 15 years between the filing of the petition in October 2006 and the trial in August 2021—is extraordinary and presumptively prejudicial, manifestly weighing in respondent's favor. Yet, this factor only triggers the analysis of the remaining three *Barker* factors. *Conley*, 2023 IL App (1st) 211084, ¶ 22.

¶ 58    We next look to the second factor, the reason for the delay, and if periods of unjustified delay suggest a deprivation of due process. Respondent tallies a total of 14 years, 10 months, that he spent in State custody, attributing over half that period (or at least 3232 days) of delay to the State. As set forth, the trial court denied respondent's motion to dismiss for a speedy trial violation on constitutional grounds after finding that a large part of the delay was instead attributable to respondent. See *Davila*, 2022 IL App (1st) 190882, ¶ 83 (noting delay is considered to have been occasioned by the defendant when his acts caused or contributed to the delay (citing *People v. Kaczmarek*, 207 Ill. 2d 288, 296 (2003))). After having reviewed the record in full, we could not agree more.

¶ 59    Here, the record shows that between the State's 2006 SVP petition and 2014, respondent filed two motions to dismiss under section 15 of the Act (see 725 ILCS 207/15 (West 2006)), one

in 2007 and one four years later in 2011, and the court gave careful consideration to the parties' briefed arguments before issuing written denials; respondent's original counsel withdrew in 2008 due to respondent's obstreperous behavior; and, after the court denied the second dismissal motion, respondent filed an interlocutory appeal under Rule 308, over the State's objection. This court agreed with the State that the certified questions did not qualify for consideration under Rule 308 and ultimately dismissed the appeal as improvidently granted. See *Sewell*, 2014 IL App (1st) 132151-U, ¶ 11, 17. The trial court ordered the parties to hold any depositions and other discovery while the appeal was pending, and respondent did not object.

¶ 60      These delays by respondent engendered more delays on remand. Given that the case was eight years old, updated psychological evaluations were needed, but the psychological evaluators crucial to the case had since retired or moved out of state. Respondent also filed a motion for a *Frye* hearing in 2015, and more after that, even though the court concluded Illinois case law resoundingly supported that OSPD was generally accepted in the scientific community. Between May 2016 and March 2018, respondent wasted nearly two years contesting the State's request to obtain a new evaluator to replace Dr. Dobier. Then, he spent another year seeking documents from other cases in which the State's experts had testified; initially, he argued for five years' worth of such documents but was ordered to seek only one year. He sought a motion to reconsider that order, among others, and even filed a third motion to dismiss in 2021. Depositions of experts also were conducted. Respondent has not made clear on appeal how any of this discovery litigation benefitted him at trial, but all this added to the lengthy delay.

¶ 61      Moreover, the August 2019 jury trial did not take place for various reasons, including the court's family funeral, extended argument on the motions *in limine*, the State having filed an amended petition, respondent having waived his appearance, and the consequent unavailability

of the State's expert. The State filed a motion for a short continuance, which was granted after the court found there was no "attempt to delay the matter for any less than valid reasons." See *People v. Echols*, 2018 IL App (1st) 153156, ¶ 25 (noting that the unavailability of a witness is also a valid reason for delay). Notably, during respondent's year's long institutionalization, this was the only time respondent objected to a continuance. Yet, an agreement to continue the case is properly chargeable to the respondent, and a respondent is bound by the acts of his attorney. See *Kaczmarek*, 207 Ill. 2d at 296; *Davila*, 2022 IL App (1st) 190882, ¶ 83. Respondent has not raised any question as to the competency of his counsel. See *In re Commitment of Moore*, 2023 IL App (5th) 170453, 47 (noting the Act provides a respondent with a right to effective assistance of counsel).

¶ 62    Respondent nonetheless contends that the delay relating to Dr. Dobier is attributable to the State. Respondent still, even on appeal, maintains the State misrepresented that Dr. Dobier was "retiring when she was not retiring," a specious argument given that she ultimately retired from the Department of Human Services and was no longer conducting SVP evaluations, even if she found a job elsewhere.[10] Respondent also insists the State displayed "gamesmanship and intentional delay" as to the discovery requests, apparently from 2016 to 2018. Respondent further attempts to identify other periods of delay attributable to the State, including July 2009 to December 2010, when the State replaced Dr. Quackenbush with Dr. Leavitt and submitted Dr. Leavitt's report; December 2010 to May 2011, when respondent deposed Dr. Leavitt and the State allegedly sought to replace another evaluator; March 2014 to July 2014, when the State tendered Dr. Dobier's report; and January 2020 to August 2021, during the pandemic.

---

[10]Notably, on appeal, respondent does not properly challenge the trial court rulings with respect to Dr. Dobier.

¶ 63    In rejecting his speedy trial motion, the trial court specifically found that while "the reasons for the long delay do not provide a concise explanation," it did not "find that any of the delay was occasioned by the State's intent to gain some tactical advantage," nor could it find "that [respondent] hasn't used delay as a tactic for his own advantage." Based on the foregoing and our reading of the record, we cannot say this conclusion is against the manifest weight of the evidence. The court did not find any bad faith on the State's part relating to Dr. Dobier or the discovery. Respondent's contrary contentions are thus disingenuous and belied by the record. While respondent complains that the State took several months in 2014 to tender Dr. Dobier's report, he too had requested the appointment of a new expert at that time. Respondent also cannot fault the State for witnesses retiring or his own requests to conduct depositions of experts. See *Crane*, 195 Ill. 2d at 53. On balance, the periods respondent identified either were caused by his own dilatory tactics or, given his agreed continuances and the pace of this case, perfectly reasonable.[11] See *Kaczmarek*, 207 Ill. 2d at 296 (finding the defendant caused or contributed to nearly all the pretrial delay); *O'Quinn*, 339 Ill. App. 3d at 355 (same). We have already concluded that the pandemic served as a valid reason to continue the case. See *Conley*, 2023 IL App (1st) 211084, ¶¶ 23-25; *People v. Johnson*, 2023 IL App (4th) 210662, ¶ 62 (finding pandemic continuances valid under *Barker* and delays neither attributable to the State nor the defendant). When considered in totality, we cannot say the second factor involving the reason for the delay weighs in favor of respondent.

---

[11]For example, as to the pace of the case, we note that during one year (between June 2009 and June 2010), respondent's counsel requested or agreed to continuances in order to complete expert evaluations, conduct depositions and discovery, and aid respondent with his *pro se* motion. From December 2010 to May 2011, respondent again requested continuances to conduct depositions. In September 2015, respondent announced he was waiting for an updated evaluation from Dr. Heaton, requesting a continuance, but three months later announced there would be no report.

¶ 64      As to the third factor, whether in due course respondent asserted his right to a speedy trial, we observe that respondent took an inordinately long time to assert his speedy trial right. He did not do so until January 2020, and by the time his motion to dismiss had been argued and considered, the pandemic was well underway with jury trials on hold. In fact, respondent's only period assiduously demanding trial was during a worldwide pandemic and after having caused or acquiesced to the years-long delay. "We emphasize that failure to assert the right will make it difficult for a defendant," or in this case a respondent, "to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532; see *Crane*, 195 Ill. 2d at 58-59. Further, although a respondent has no duty to bring himself to trial, an earlier assertion of the right might have prevented the delay. *Crane*, 195 Ill. 2d at 62. Accordingly, this factor does not weigh in respondent's favor. See *Conley*, 2023 IL App (1st) 211084, ¶ 25; *Echols*, 2018 IL App (1st) 153156, ¶ 35.

¶ 65      The fourth and final *Barker* consideration is prejudice to the respondent. Prejudice must be assessed in light of the respondent's interests, which the speedy-trial right was designed to protect. *Kaczmarek*, 207 Ill. 2d at 299. Those interests are the prevention of oppressive pretrial incarceration, the minimization of respondent's anxiety and concern over the pending charge, and most importantly, limiting the possibility the defense will be impaired by the delay. *Id.* The last factor is most serious because a respondent's inability "to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

¶ 66      Here, respondent has not identified how the lengthy delay, occasioned mostly by his own conduct, impaired his ability to prepare his defense. The record does not contain any of the depositions respondent took of the State's witnesses, or the evaluation by his own expert, and respondent did not present any evidence contesting that he was still an SVP. As the Supreme

Court of California astutely noted in *Camacho v. Superior Court of Merced County*, 534 P.3d 484, 506-07 (Cal. 2023), when denying prejudice:

> "[T]rial on a petition for commitment under the SVP Act aims to establish whether a person meets the definition of an SVP *at the time of trial*. This inquiry is categorically different from that of a criminal trial, where the issue is whether the defendant's past conduct constitutes guilt of a particular offense. In the SVP context, then, time ordinarily will not erase critical evidence for the defense, since the jury relies on recent expert evaluations to evaluate whether the individual qualifies as an SVP at the time of trial." (Emphasis in original.)

But see *Davila*, 2022 IL App (1st) 190882, ¶ 88 (acknowledging that excessive delay may cause presumptive prejudice).

¶ 67    Although the impairment of liberty and detention prior to a proper adjudication was significant (see *Crane*, 195 Ill. 2d at 59), the record here does not suggest respondent's pretrial incarceration was oppressive. In 2006, the trial court found there was probable cause to conclude respondent was an SVP due to his mental illness and in need of institutionalization. For two years, until 2008, respondent remained institutionalized while also serving his MSR due to a parole violation. See 725 ILCS 207/15(e) (West 2006) (providing that the filing of a petition tolls MSR). He does not dispute the parole violation or his MSR placement, which involved his separate 1986 criminal conviction. As such, respondent was effectively institutionalized on the State's petition for closer to 13 years. As trial evidence established, during his years of institutionalization, respondent did not participate in any SVP treatment. See *Camacho*, 534 P.3d at 507 (noting pretrial treatment of the mental disorder may facilitate the individual's release before trial); *cf. Barker*, 407 U.S. at 532-33 (noting most "jails offer little or no recreational or

rehabilitative programs" and time spent there is "simply dead time"); *In re Ellison*, 385 P.3d 15, 29-30 (Kan. 2016) (finding a speedy trial violation, where among other reasons, the respondent, who was jailed for four years while awaiting trial as a sexually violent predator, did not have the opportunity for treatment and release). Nothing in the record suggests respondent ceased suffering from his mental disorders, congenital or acquired, which affected his emotional or volitional capacity predisposing him to engage in acts of sexual violence. See 725 ILCS 207/5 (West 2018).

¶ 68    We therefore reject respondent's contention that the prejudice here is "manifest" since he "could not obtain employment in the community, live with his family, or participate in the myriad of benefits in which members of free society may engage." Respondent's history of committing violent sex offenses while free, after having escaped jail and while on MSR, contradicts any claim that his time in the community would have been well-spent given his mental disorders. Rather, the record evidence suggests respondent would have ended right where he began. While we agree that his anxiety and concern must be considered, we cannot say that alone is sufficient to find prejudice. See *Kaczmarek*, 207 Ill. 2d at 300; *Davila*, 2022 IL App (1st) 190882, ¶ 88. Thus, this final factor does not weigh in respondent's favor, as there was no evidence of prejudice. See *Kaczmarek*, 207 Ill. 2d at 300; see also *Conley*, 2023 IL App (1st) 211084, ¶ 24.

¶ 69    The record, including respondent's failure to object to nearly all the continuances, demonstrates that respondent did not want a speedy trial. See *Barker*, 407 U.S. at 536; *Kaczmarek*, 207 Ill. 2d at 300. Although we cannot condone the delay to trial, after conducting the difficult and sensitive balancing test under *Barker*, we conclude it does not qualify as a constitutional violation warranting the severe remedy of outright case dismissal. See *Davila*,

2022 IL App (1st) 190882, ¶ 89. Based on the foregoing, we reject respondent's speedy trial claims. The trial court did not err in denying his motions to dismiss.

¶ 70                                 B. *Timeliness of the State's SVP Petition*

¶ 71    Respondent next contends that under section 15(b-5)(1) of the Act, the State's SVP petition was untimely filed in October 2006. Section 15(b-5)(1) stated in relevant part that the petition had to be filed:

> "No more than 90 days before discharge or entry into mandatory supervised release from a Department of Corrections correctional facility for a sentence that was imposed upon a conviction for a sexually violent offense, or for a sentence that is being served concurrently or consecutively with a sexually violent offense, and no more than 30 days after the person's entry into parole or mandatory supervised release[.]" 725 ILCS 207/15(b-5)(1) (West Supp. 2005).

¶ 72    Respondent first contends that he had no MSR date when the State filed its petition. The law provides that the State may file an SVP petition no more than 90 days before either the actual date a prisoner enters MSR or the anticipated date for such release. *Powell*, 217 Ill. 2d at 142-43 (noting where an inmate willfully delays his actual entry on MSR, it is not his actual entry date, but rather the anticipated date, that determines whether the SVP petition is timely filed). Here, based on the following facts, respondent had an actual date of reentry into MSR on October 6, 2006.

¶ 73    Respondent first entered MSR for his 1986 convictions (home invasion, residential burglary, and aggravated battery) on August 5, 2005. About a year later, in July 2006, respondent returned to the physical custody of the Department of Corrections on a warrant for violating his MSR conditions, and a violation report was then filed. On September 19, 2006, the Prisoner

Review Board issued an order declaring that respondent had violated his MSR, which would continue "[e]ffective when plans are approved." Testimony from the discovery deposition of Welch, the Department of Correction's assistant chief records officer, confirms that respondent's MSR reentry plan was approved on October 6, 2006, when he was transferred from prison to a Department of Human Services host site. The Department of Corrections determined that, there, he would serve the remainder of his MSR term for his 1986 convictions. As the trial court noted, once respondent formally reentered MSR on October 6, his discharge date was recalculated to September 19, 2008. This further confirms that his MSR reentry date was October 6. The State's October 5, 2006, SVP petition therefore was timely filed within 90 days of respondent's reentry into MSR.

¶ 74     Respondent nonetheless contends that the State's petition and his transfer to the Department of Human Services' facility improperly "triggered" the MSR date. He writes that he "remained in IDOC custody until October 5, 2006, when the State filed its SVP petition." We note that the Department of Corrections retains legal custody of an offender until discharge of his sentence. *In re Detention of Gardner*, 307 Ill. App. 3d 85, 90 (1999). Thus, regardless of the State's commitment petition, the Department of Corrections also retained legal custody of respondent on October 5, as he was being held on his MSR violation, and it still had legal custody of him on October 6, until his discharge from his 1986 convictions on September 19, 2008. This was notwithstanding that respondent was transferred into the physical custody of a Department of Human Services facility to serve out the remainder of his sentence. Moreover, as Welch testified, it is the Department of Corrections that decides on the host site.

¶ 75     Respondent also complains that there is no evidence that the Prisoner Review Board finalized his MSR plan. He claims this shows he did not have an MSR reentry date. He notes, for

example, that an inmate must be provided a written and signed copy of his MSR conditions prior to release. See 730 ILCS 5/3-3-7 (West 2006). As the State observes, the record, including Welch's testimony and the Prisoner Review Board order, shows that respondent's MSR conditions simply continued when he reentered MSR, only at a different host site than where he had previously resided. See *id.* § 3-3-9 (noting that following an MSR violation, the Prisoner Review Board may "continue the existing term, with or without modifying or enlarging the conditions"). Indeed, Welch testified that the MSR agreement, which respondent originally signed, was part of his master file, although it does not appear in the record. See *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 34 (noting it is the defendant's burden as the appellant to provide a sufficiently complete record on appeal). Presumably, respondent had already received a copy of those conditions. See *id.* Regardless, we agree with the State that whether the Department of Corrections fulfilled its paperwork obligations to respondent does not affect the validity of the State's petition. Moreover, the Department of Corrections' own record keeper testified to respondent's MSR reentry date, which is sufficient for our purposes.

¶ 76    Respondent alternatively contends the Act imposed a 30-day limitation on SVP petitions once a person entered MSR. See 725 ILCS 207/15(b-5)(1) (West Supp. 2005) (noting a petition must also be filed "no more than 30 days after the person's entry into parole or mandatory supervised release"). He maintains the State's October 6, 2006, petition was filed long after his initial entry into MSR on August 5, 2005, making the petition untimely.

¶ 77    The State responds that respondent forfeited this argument, and regardless, it is meritless. We agree. See *Valdovinos v. Tomita*, 394 Ill. App. 3d 14, 21 (2009) (issues not raised in a motion to dismiss are forfeited on appeal). A similar argument was already disposed of in *In re Detention of Allen*, 331 Ill. App. 3d 996, 1001-02 (2002), which found that the plain language of

the Act did not limit the State's ability to file an SVP petition to only the first MSR entry date. Thus, the State may properly file the petition 90 days before reentry into MSR. See *id.*; see also 725 ILCS 207/15(b-7) (West 2018) (amending the Act, so that a "person convicted of a sexually violent offense remains eligible for commitment as a sexually violent person *** [when] the person returns to the custody of the Illinois Department of Corrections *** for any reason during the term of *** mandatory supervised release being served for a sexually violent offense").

¶ 78    Last, respondent contends the State's SVP petition was untimely because he was not serving a sentence imposed on a conviction for a sexually violent offense or for a sentence that was being served concurrently with or consecutively to a sexually violent offense when the petition was filed, as required. See 725 ILCS 207/15(b-5)(1) (West Supp. 2005). Respondent notes that when the State filed its petition in 2006, he was serving his sentence on his 1986 convictions for home invasion, residential burglary, and aggravated battery—all non-sexually violent offenses. He also notes that there was no finding by the criminal court as to whether his 1986 convictions would run concurrently with or consecutively to his 1976 sex offense convictions, which were discharged on July 18, 1987. Respondent thus argues he did not fall under the strictures of the Act. We disagree.

¶ 79    In *In re Detention of Gavin*, 382 Ill. App. 3d 946 (2008), while on MSR for a sexually violent offense, the respondent committed burglary and was subsequently charged and convicted of the offense. The respondent's sentence for the sexually violent offense was discharged while he was still in custody serving his burglary sentence, and he remained imprisoned for seven more years. Prior to the start of his MSR term for burglary, the State filed an SVP petition to commit the respondent. This court found that when the petition was filed, the respondent was serving his burglary sentence concurrently to his sexually violent offense sentence, and therefore, the State's

petition was timely. We reasoned that "in the absence of a provision to the contrary in the judgment order, the sentences are presumed to run concurrently." *Id.* at 950. We further reasoned that "the time period in which the State has to file the petition is continued until within 90 days before *** entry into MSR for a sentence served concurrently or consecutively to a sexually violent offense." *Id.*

¶ 80    Similar facts present themselves here. Welch testified that respondent was paroled on February 3, 1984, for the sexually violent offenses he committed in 1974 and 1975. He had a three-year window for parole. Respondent, however, violated parole two years after his release, on February 7, 1986, and he was returned to prison. Respondent was sentenced on October 7, 1986, for home invasion, residential burglary, and aggravated battery. Welch testified that respondent then served his 1986 sentence concurrently with the 1974 and 1975 sexually violent offense sentences, until the 1974 and 1975 sentences were discharged on July 18, 1987. In 2006, the State filed its SVP petition 90 days before respondent reentered the MSR term stemming from his 1986 conviction.

¶ 81    Consistent with *Gavin*, respondent was serving his home invasion, residential burglary, and aggravated battery sentence concurrently with his sexually violent offense sentences, and therefore, the State's petition was timely. As the trial court astutely noted, because respondent was still in prison when his sexually violent offenses were discharged in 1987, the State could not have filed the SVP petition then. For all the foregoing reasons, respondent's contention that the State's SVP was untimely must fail. The trial court did not err in denying his motions to dismiss.

¶ 82                                    C. *Records Review*

¶ 83    Respondent next contends that the trial court denied him his due process right to a fair trial when it declined to permit his court-appointed expert, Dr. Heaton, to interview him in person and instead limited the updated evaluation to a records review. This matter is controlled by section 30(c) of the Act, which states that if the court determines there is probable cause to believe that the accused is an SVP, the accused must then be further evaluated to determine if he is an SVP. Section 30(c) continues:

> "If the person who is named in the petition refuses to speak to, communicate with, or otherwise fails to cooperate with the examining evaluator from the Department of Human Services or the Department of Corrections, that person may only introduce evidence and testimony from any expert or professional person who is retained or court-appointed to conduct an examination of the person that results from a review of the records and may not introduce evidence resulting from an examination of the person." 725 ILCS 207/30(c) (West 2018).

¶ 84    Here, following respondent's probable cause hearing, he refused to speak in person to the Department of Human Services evaluators. The State also notes parenthetically that respondent refused to speak to Dr. Heaton earlier in 2009. Therefore, in accordance with the Act, the trial court rightly confined respondent's expert, and those of the State, to reviewing respondent's records. See *id.* §§ 30(c), 25 (noting both parties may retain experts to perform a required examination, and they shall have access "to the person's past and present treatment records and patient health care records").

¶ 85    Respondent nonetheless contends the State retained an unfair strategic and evidentiary advantage because Dr. Quackenbush interviewed respondent in person. However, Dr. Quackenbush did so in August 2006, while respondent was in Stateville Correctional Center due

36

to his MSR violation. This was prior to the State's October 2006 SVP petition, and Dr. Quackenbush then only testified at the probable cause hearing. We observe that section 30(c) addresses expert evaluations conducted *after* the probable cause hearing, when the goal is to determine whether the person is an SVP. Moreover, Dr. Quackenbush did not testify at trial. His evaluation therefore simply became part of the records in respondent's case. See 725 ILCS 207/30 (West 2006) (noting that all Department of Corrections treatment records shall be admissible at proceedings under the Act); 725 ILCS 207/30 (West 2018) (same).

¶ 86    We thus find respondent's reliance on *In re Detention of Trevino*, 317 Ill. App. 3d 324 (2000), misplaced. *Trevino* addressed a prior version of section 30(c), which prohibited an accused who refused to cooperate with the court-ordered Department of Human Services' evaluation from introducing testimony or evidence from any expert retained or appointed for his evaluation. See 725 ILCS 207/30(c) (West 1998). In *Trevino*, the State called an expert to testify at the respondent's SVP trial who had examined the respondent at the Department of Corrections before the State filed its petition. Yet, at trial, the court confined the respondent's own expert to a review of the materials relied on and obtained by the State's expert. This court held that section 30(c) as applied denied the respondent due process "by barring him from presenting the testimony of an examining expert to contradict the testimony offered by the State's examining expert." *Trevino*, 317 Ill. App. 3d at 331. The court held this violated the statute's goal of presenting the parties an opportunity to "present evidence substantially equal in character." *Id.*

¶ 87    As set forth, in this case neither party was permitted to call an examining expert. There was no imbalance in the application of the statute. See *id.* (noting that if the State calls only nonexamining experts, the respondent must be permitted to call one as well (citing *In re Detention of Kortte*, 317 Ill. App. 3d 111, 118 (2000))).

¶ 88    Respondent also contends the court unfairly precluded Dr. Heaton from speaking to respondent. He argues section 30(c) "restricts only the testimony that may be introduced at trial, and not the scope of the expert's evaluation process." Respondent's argument is belied by the plain and unambiguous language of the Act, which must be applied as written to give effect to legislative intent. See *Snedeker v. Will County State's Attorney's Office*, 2022 IL App (3d) 210133, ¶ 11. We also presume the legislature did not intend absurd or unjust results. *In re Application of the County of Collector*, 2023 IL App (1st) 210523, ¶ 22. It would make little sense to permit respondent's expert to speak with respondent if the expert could not then rely on or introduce evidence from the interview at trial. Likewise, it would encourage respondents to speak only to their own evaluators, to the exclusion of the State. For the reasons stated, respondent's claim fails.

¶ 89                D. *Respondent's Motion for a* Frye *Hearing*

¶ 90    Respondent next contends the trial court erred in admitting evidence at trial as to his mental disorder, OSPD nonconsent, without first conducting a *Frye* hearing. He argues this diagnosis is not generally accepted in the scientific community.

¶ 91    We decline to entertain this argument any further. Illinois case law has long held that a *Frye* hearing need not take place where, as here, courts may determine the general acceptance of a scientific principle or methodology by taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject. *In re Detention of Hayes*, 2014 IL App (1st) 120364, ¶ 35. This court has held that it is appropriate to take judicial notice that OSPD nonconsent is generally accepted in the psychological community and, as such, a *Frye* hearing is unnecessary. *Id.* ¶¶ 35-36; see *Brown*, 2021 IL App (1st) 191606, ¶ 91 (noting "Illinois courts have consistently held that OSPD nonconsent is generally accepted within the scientific

community"); *Adams*, 2021 IL App (1st) 182049, ¶ 56; *In re Detention of Melcher*, 2013 IL App (1st) 123085, ¶¶ 58-62. Respondent offers no reason for us to depart from this binding precedent. We also decline respondent's invitation to apply a test other than *Frye*, as that would be contrary to our supreme court precedent and Illinois rules of evidence. See *In re Detention of New*, 2014 IL 116306, ¶ 25 (noting, in Illinois, the admission of scientific evidence is governed by the *Frye* standard).

¶ 92                                    E. *Cross-Examination of Expert*

¶ 93     Last, respondent contends the trial court erred by restricting his cross-examination of the State's expert, Dr. Travis. He asks that we reverse and remand for a new trial. Generally, experts may be cross-examined for the purpose of discrediting their testimony and also to ascertain which factors were taken into account and which were disregarded in arriving at their conclusions. *People v. Wagener*, 196 Ill. 2d 269, 274 (2001). Opposing counsel is allowed to cross-examine an expert with respect to material that he has reviewed but upon which he did not rely. *People v. Pasch*, 152 Ill. 2d 133, 179 (1992). Indeed, counsel may venture beyond the facts supported by the record in inquiring as to what changes of conditions would affect his opinion. *Wagener*, 196 Ill. 2d at 274. The scope of cross-examination is an evidentiary ruling that is within the sound discretion of the trial court. *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 67.

¶ 94     Respondent specifically contends his trial counsel should have been allowed to cross-examine Dr. Travis about the efficacy of sex offender treatment, as it related to reducing recidivism risks. He maintains this cross tested the State's theory that respondent required sex offender treatment in order to manage his mental disorder and reduce reoffending. Before the

trial court, defense counsel stated he aimed to establish that treatment was *not* a protective factor against reoffense.

¶ 95    The State responds that trial proceeded with the State's unopposed motion *in limine* barring any information about the effectiveness or ineffectiveness of SVP treatment, including at the facility where respondent was held. The State explained that it did not "want the DHS facility to be put on trial in the midst of this SVP trial." The court granted that motion without objection from respondent, and respondent in fact asked that the motion basically apply to both parties. See *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) (a party cannot complain of error to which the party consented). Moreover, respondent did not argue then and does not argue now that his cross was outside the scope of the ruling or the court erred in granting the *motion in limine*. We thus agree, respondent's argument as to cross is not well-taken.

¶ 96    Respondent nonetheless observes that the court allowed him to cross Dr. Leavitt on a similar matter and, as such, argues the court should have allowed his cross of Dr. Travis. For example, during Dr. Leavitt's cross, respondent asked him whether there was any published data on recidivism rates for individuals released from the detention facility. Over the State's objection, Dr. Leavitt responded that he was unaware of data but many people benefitted from the program such that "through the result of hard work and treatment" they were placed on conditional release or discharge, living offense free. Respondent also asked Dr. Leavitt whether there was any published recidivism data about "persons who are in the treatment or detention facility who are released without treatment." Over the State's objection, Dr. Leavitt responded no.

¶ 97    Only respondent's second question to Dr. Leavitt appears to have violated the *motion in limine*. He sought to ask the same question to Dr. Travis. However, merely because

respondent violated the *motion in limine* once does not support that he should violate it twice.

Two wrongs do not make a right. Moreover, a trial court's evidentiary ruling about cross will not

be reversed unless the court abused its discretion, resulting in manifest prejudice to the

respondent. *Moody*, 2020 IL App (1st) 190565, ¶ 67. Respondent cannot claim prejudice where

he had already placed the information before the jury via Dr. Leavitt. See *id.* In addition, to the

extent respondent sought to ask additional questions about treatment and recidivism data, he has

not submitted an offer of proof establishing that any data exists or what the excluded testimony

would have revealed. See *Brown*, 2021 IL App (1st) 191606, ¶ 94; *People v. Andrews*, 146 Ill. 2d

413, 421 (1992) (noting the purpose of an offer of proof is to disclose the nature of the offered

evidence, enabling a reviewing court to determine whether exclusion of the evidence was

proper).

¶ 98    Accordingly, the trial court did not abuse its discretion by limiting cross on data

regarding the treatment of sex offenders, where the principal issue at trial was whether

respondent was an SVP to begin with. See *People v. Frazier*, 2019 IL App (1st) 172250, ¶ 26

(noting an abuse of discretion occurs if the court's decision is arbitrary, fanciful, or

unreasonable). Respondent's contention as to cross fails.

¶ 99                                    CONCLUSION

¶ 100   For the reasons stated, we affirm the judgment of the trial court.

¶ 101   Affirmed.

***In re Commitment of Sewell*, 2023 IL App (1st) 220168**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 06-CR-80015; the Hon. Steven G. Watkins, Judge, presiding. |
| **Attorneys for Appellant:** | Michael R. Johnson, of Law Office of Michael R. Johnson LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Katherine M. Doersch and Eldad Z. Malamuth, Assistant Attorneys General, of counsel), for the People. |